# Illinois Official Reports

## Appellate Court

---

### *People v. Williams*, 2013 IL App (1st) 112693

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLARENCE WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-11-2693 |
| Filed | December 26, 2013 |
| Rehearing denied | February 6, 2014 |
| Modified upon<br>denial of rehearing | February 13, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder on an accountability theory in a gang-related shooting was reversed and the cause was remanded with directions to impose a sentence on defendant for the lesser offense of aggravated discharge of a firearm, since the evidence was too inconsistent and conflicting to prove defendant's guilt of first-degree murder beyond a reasonable doubt, and the trial court also improperly required defendant to register as a sex offender in the absence of any indication that the charged offense was sexually motivated. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-1009(03); the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Reversed and remanded for sentencing. |

Counsel on        Michael J. Pelletier, Alan D. Goldberg, and Emily S. Wood, all of
Appeal            State Appellate Defender's Office, of Chicago, for appellant.

                  Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg,
                  William L. Toffenetti, and Peter Maltese, Assistant State's Attorneys,
                  of counsel), for the People.

Panel             JUSTICE LAVIN delivered the judgment of the court, with opinion.
                  Presiding Justice Howse and Justice Fitzgerald Smith concurred in the
                  judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant Clarence Williams was found guilty of one count of first-degree murder based on an accountability theory. Defendant received a sentence of 23 years in prison and an additional 20-year firearm enhancement. 730 ILCS 5/5-8-1(a)(1)(a), (a)(1)(d)(ii) (West 2006). On appeal, defendant asserts that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred by admitting gang evidence through an unqualified witness and a witness's prior consistent statement; (3) the murder was not sexually motivated and defendant should not be required to register as a sex offender; and (4) defendant's mittimus should be corrected to reflect that he was convicted of first-degree murder with a mandatory firearm enhancement, not two first-degree murder convictions. We reverse defendant's conviction for first-degree murder and remand for sentencing on the lesser offense of aggravated discharge of a firearm.

¶ 2                            BACKGROUND
¶ 3    On October 17, 2007, 10-year-old Arthur Jones (AJ) was shot and killed during an apparent gang dispute. Defendant, whom the trial court ultimately found not to be a gang member, was charged with first-degree murder along with codefendants Lesean Jackson and Steven McCaskill. Andrew Bradley, then a 14-year-old, was subjected to juvenile delinquency proceedings.
¶ 4    Over the course of a six-day bench trial, 15 witnesses testified.[1] Johnell Brown testified that he belonged to the Black P Stones street gang (P Stones), which "controlled" the north side of 55th Street or Garfield Boulevard. The Jet Black Stones (Jets) also occupied the area as a

---

[1]A jury trial was conducted simultaneously for codefendant Jackson.

branch of the P Stones (collectively called the Stones). A rival street gang, the Gangsters Disciples (GD), "controlled" the south side of 55th Street. Brown testified that around 3:30 p.m. on the day of the incident he sold cigarettes at the corner of 55th Street and Halsted Street. He also testified that he knew defendant, McCaskill and Jackson from the neighborhood and all three were members of the Jets. When a fight broke out between the Stones and the GD in a gas station on the south side of the boulevard, Brown went over to try and "squash" the fight, but eventually got involved when he tried to rescue his friend Jimmy. Brown also saw defendant and McCaskill in the area of the Shell station and then saw them leave together heading north.

¶ 5        Eventually, Brown returned to his "business," crossing over to the east side of Halsted Street, where he had hidden cigarettes and marijuana by the bus stop near the mall. While standing there, Brown saw defendant, codefendant Jackson and McCaskill walk though the mall area, but he could not recall Bradley's whereabouts. Brown also observed some high school youths hanging out in the grassy area in the middle of the boulevard. He then saw Jackson, who was standing behind the bus stop, point a semiautomatic gun toward the southwest corner of the intersection. On direct examination, Brown testified that he heard defendant tell Jackson "to wait" and then saw defendant walk toward the back of the mall. Brown then saw Jackson fire four shots into the grassy area of the boulevard. Afterward, Brown took off running toward 54th Street and heard another round of shots.

¶ 6        On cross-examination, Brown admitted that he was found guilty of manufacturing and delivering a controlled substance in 2000, as well as possession of a controlled substance in 2003 and 2004. Brown allowed that he disliked defendant and wanted to "beat his ass" because of his relationship with Brown's sister. Regarding gang membership, Brown testified that he never saw defendant get initiated into the Jets. In addition, Brown testified that he did not hear defendant tell Jackson to wait before firing and he did not recall making that statement to detectives.

¶ 7        On redirect examination, over defense counsel's objection, the judge allowed the State to read into evidence prior consistent testimony that Brown had given before a grand jury to rebut a charge of recent fabrication. The prior testimony included the following colloquy:

"Q. Did you say anything when Lesean put up the gun?

A. Yes.

Q. What did you say?

A. I told him not to shoot, there's kids out there.

Q. Did [defendant] say anything about this?

A. Yes.

Q. Did [defendant] say anything to [Jackson] or give him instructions?

A. He say wait until they get closer, and then [Jackson] start firing."

¶ 8        Pursuant to a stipulation, defense counsel also introduced prior statements made by Brown to Chicago police. In this statement, he said "if ya'll want me to turn State evidence and that's what I'll have to do, and that's what I'll have to do but I ain't have nothing to do with it." Brown was also quoted as saying "maybe they heard [defendant], it might have been

[defendant] they heard say wait until they get closer." The statement also indicated, "I said what I said. It's one of the other people that could have said that, 'wait until they get closer.' Maybe [McCaskill] or [defendant] said 'wait until they get closer.' " Finally in this statement, he stated "I don't fuck with [defendant]. I want to beat his ass plenty of times for using my sister for her money."

¶ 9    Tierra Merchant testified that around 4 p.m., she entered the Subway restaurant at the end of the mall and saw defendant talking on his cell phone in the parking lot. When Merchant was leaving five minutes later, she saw defendant fire a pistol at least twice in a southwest direction toward the Shell service station. Defendant had his face turned away and was not looking in the direction he fired. Merchant then saw defendant flee north through the parking lot.

¶ 10    Johnny Figueroa testified that at the time of the incident, he drove his vehicle through the parking lot behind the mall. He waited in the driveway to merge onto 55th Street when he heard gunshots to the right of his car. He then saw an African-American man fire multiple shots in a southwest direction at a crowd of people located in the median, but was unable to identify defendant as the shooter from a photo array.

¶ 11    Teddy Plummer, who claimed injuries and memory problems resulting from being hit in the head in an unrelated incident by a baseball bat, testified that he used to be friends with McCaskill and Bradley from the neighborhood, but denied knowing Jackson. Plummer testified that he did not remember (1) if Bradley, McCaskill or Jackson was a member of the Jets street gang; (2) what happened on the afternoon of the incident; (3) going to the police station with his parents thereafter; (4) signing his statement in which he claimed to have witnessed Bradley put a 9-millimeter handgun in Jackson's hoodie pocket; (5) identifying Jackson as the shooter; (6) hearing someone tell Jackson to wait before shooting; or (7) testifying in front of the grand jury to the factual account in his statement. On the second day that Plummer testified at defendant's trial, Plummer's memory returned. Specifically, he remembered being at 55th Street and Halsted Street after school. He then witnessed Bradley pass a 9-millimeter handgun to McCaskill, who shot AJ. Plummer claimed that he told the grand jury he gave it to Jackson, because Plummer felt bad telling on his friend McCaskill. He also told the grand jury that prior to Jackson firing, someone said, "no, don't do it, don't do it, stop, wait, wait," and testified that it sounded like McCaskill. On cross-examination, Plummer claimed to have been afraid in 2007 because of his non-gang affiliation and the Jets' code of silence. He had changed his recitation of the facts at the grand jury hearing to protect himself and McCaskill, a known gang member.

¶ 12    Bradley, who had his charges reduced as part of a plea agreement in a corresponding juvenile case, testified that he knew defendant, Jackson and McCaskill from the neighborhood. On the day of the incident, Bradley ran into McCaskill on Bradley's way to the barbershop. McCaskill had a black semiautomatic gun, handed it to Bradley, and asked him to shoot the gun at the GD. After declining, McCaskill told Bradley to hand the gun to Jackson and Bradley complied. He then walked to the barber shop on 54th Street and heard approximately three gunshots fired from the other direction. He did not recall seeing defendant before or after either round of gunshots. The State impeached Bradley with prior testimony given as part of his plea

agreement that he heard a second round of shots and then saw defendant running. Bradley testified that he "may have" said that, but did not recall.

¶ 13    On cross-examination, Bradley testified that he (1) was willing to say whatever the State wanted him to say; (2) did not see defendant on the street that day or at any time before or after the shooting; and (3) did not see defendant shoot a gun. In addition, pursuant to a stipulation, defense counsel read into evidence statements made by Bradley to Chicago police claiming that *Brown* told Jackson to wait until the cars passed to start shooting.

¶ 14    Detective Robert Garza testified that he interviewed McCaskill on the night of the incident and received the names of defendant, Bradley, Plummer and Jackson. McCaskill also identified photographs of defendant and Jackson from a photo array. McCaskill eventually incriminated himself.

¶ 15    McCaskill, who pled guilty to first-degree murder in this case, testified that he had known defendant, Jackson and Bradley from the neighborhood. On the day of this incident, McCaskill, a member of the Jets, said he was not involved in the fight at the Shell service station, but he did shop in the mall across the street. McCaskill spoke to Bradley before the shooting and went to McCaskill's grandmother's home, but failed to remember if he retrieved a gun from her couch. He then returned to the mall with Bradley, but denied giving him a gun. In addition, McCaskill observed Jackson at the mall, but did not see Bradley give Jackson a gun, or see Jackson even holding a gun. McCaskill heard shots and ran away. Furthermore, McCaskill did not remember telling Detective Garza any of the allegations in his written statement. The State also admitted into evidence the videotape of McCaskill's conversation with Detective Garza, in which McCaskill stated that he saw defendant participate in the fight at the Shell service station as impeachment for his inconsistent testimony.

¶ 16    On cross-examination, McCaskill averred that he said anything he could to get himself out of trouble. In addition, he testified that he gave the gun to Brown, who said wait until the crowd crossed the street before firing. McCaskill further testified that he (1) did not see defendant by the bus stop prior to the shooting; (2) did not see defendant talk to Jackson or Bradley; and (3) never made a plan with defendant to shoot anyone. Over the prosecutor's objection, defense counsel read into evidence prior statements made by McCaskill to Chicago police detectives. McCaskill claimed that Brown set the whole shooting up, told Jackson to wait before firing, and gave the command to start shooting. In addition, he testified that defendant had no involvement in the shooting.

¶ 17    The State, over defense counsel's objection, also played a video of a conversation defendant had with Assistant State's Attorney (ASA) Margaret Ogarek. Defendant claimed that he was present at the fight at the Shell service station, but did not participate in it. He was holding a gun in his pocket for a friend. After the fight, defendant saw McCaskill, who said he was going to get "something," which defendant took to mean a gun. He went to his cousin's house, but was sent back out by his aunt to look for his cousin. He saw a group of GD advancing and a group of Stones nearby, so he walked over to the mall to avoid being caught up in the conflict. He was on his cell phone near the Subway restaurant when he heard gunshots. Defendant then fired one shot up into the air as a spontaneous response out of fear

and to disperse the crowd. It was never his intention to shoot or kill anyone. In addition, it was stipulated that defendant had no gang tattoos.

¶ 18     The trial judge found defendant guilty of first-degree murder and found that defendant personally discharged a firearm during the commission of the offense. After denying defendant's motion for a new trial, the court sentenced him to 23 years in prison for his conviction of first-degree murder and an additional 20 years pursuant to the statutory firearm enhancement. 730 ILCS 5/5-8-1(a)(1)(a), (a)(1)(d)(ii) (West 2006). We note that at sentencing, the court specifically stated, "Do I think that you had gang affiliation? No." Subsequently, the trial court denied defendant's motion to reconsider his sentence.

¶ 19                                            ANALYSIS

¶ 20     On appeal, defendant asserts the evidence was insufficient to sustain his conviction for first-degree murder because he did not share any common criminal intent or design with any of his codefendants. We agree. Where, as here, a defendant challenges the sufficiency of the evidence to sustain his conviction, the question for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In a bench trial, the trial judge has the responsibility to determine the credibility of the witnesses, to weigh the evidence and draw *reasonable* inferences. *People v. Little*, 322 Ill. App. 3d 607, 618 (2001). Nonetheless, the fact finder's decision is not conclusive and the reviewing court may not allow *unreasonable* inferences. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Furthermore, to sustain a conviction for first-degree murder, the State must prove that a defendant killed an individual without lawful justification and in performing the acts which caused the death, he intended to kill or do great bodily harm or knew that his acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2006); *People v. Leach*, 405 Ill. App. 3d 297, 311 (2010).

¶ 21     The principal issue in this case is whether defendant was proved legally accountable beyond a reasonable doubt for the conduct of Jackson, whom the record indicates was the person that the State theorized killed the victim. In a petition for rehearing, the State plainly asserts that it did *not* attempt to persuade the trial judge and jury that it was codefendant Jackson who fired the fatal shot, perhaps in an attempt to persuade this court that defendant *may* have been responsible. Unfortunately for the State's new position, this statement is not only inconsistent with the record of the trial itself, it was directly conceded at oral argument. The State expressly admitted at oral argument that its theory at trial was that Jackson fired the shot that killed the child and that defendant should be held accountable for Jackson's actions because they shared a common design on that date and at that time. A defendant is accountable for the conduct of another when he, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, solicits, aids, abets, agrees or attempts to aid, such other person in the planning of the offense. 720 ILCS 5/5-2(c) (West 2006); *People*

*v. Gabriel*, 398 Ill. App. 3d 332, 344-45 (2010). To prove accountability, the evidence must demonstrate beyond a reasonable doubt that either (1) the defendant shared the criminal intent with codefendants; or (2) there was a common criminal design between defendant and codefendants. *People v. Perez*, 189 Ill. 2d 254, 266 (2000).

¶ 22    Here, the State presented very little evidence on the issue of accountability. The parties agree that this dispute commenced with the fight at the Shell service station. No one testified that defendant was an instigator of that fight. Even assuming that he was fighting, the record does not preclude the possibility that he was fighting defensively. In addition, while McCaskill told defendant that McCaskill was going to go get a gun, the record does not indicate that defendant responded to McCaskill's statement, let alone encouraged the conduct.

¶ 23    As to defendant's potentially accountable conduct that took place *after* the fight, the State's case rested heavily on Brown's testimony. Although Brown's testimony with respect to the trial of codefendant Jackson was corroborated by other witnesses, here, Brown's testimony with respect to defendant's activities was uncorroborated. In addition, Brown's testimony was inconsistent and self-serving. First, Brown told police that he would do whatever he could to protect himself. He also informed police that he did not like defendant based upon what he felt was an abusive relationship that defendant had with Brown's sister. During his interrogation with police, an obvious effort was made to educate this soon-to-be crucial witness on the vagaries of accountability law. Moreover, Brown's testimony on direct examination was thoroughly decimated on cross-examination as to defendant allegedly telling Jackson "to wait." On cross-examination, Brown testified that it could have been McCaskill (who had already pled guilty to first-degree murder) that told Jackson to wait. The State attempted to repair the damage on redirect examination by introducing Brown's grand jury testimony. Further, in its petition for rehearing, the State contends that Brown's grand jury testimony was introduced substantively as a prior *inconsistent* statement. See 725 ILCS 5/115-10.1 (West 2010). The record, however, suggests that Brown's grand jury testimony was brought in as a prior *consistent* statement to rehabilitate Brown. More to the point, the State's response brief in the case *sub judice* specifically states that this testimony was "properly used for rehabilitative rather than substantive purposes." The trial court's recounting of Brown's testimony reveals that there was virtually nothing to establish any evidence that would tend to prove that defendant and Jackson shared a common plan or design, with the most telling comment being the court's statement that it did not believe that defendant had any gang affiliation. This does not support the State's common design theory.

¶ 24    Here, even assuming Brown truthfully testified that defendant told Jackson "to wait" before shooting, any resulting inference endeavoring to establish that defendant was aiding or abetting Jackson was unreasonable under the evidence presented at trial which established that this was a gang shooting, while also revealing that defendant himself had no gang affiliation. Aside from gang affiliation, the State offered no other motive for defendant to conspire in a gang-related crime. See *Cunningham*, 212 Ill. 2d at 283 (where a fact finder's judgment must be reasonable in light of considering the whole record). Although Brown testified that he saw defendant with Jackson, only rank speculation would equate defendant's presence to his planned participation in Jackson's conduct. Thus, the trial court's finding that defendant was

conspiring with Jackson conflicted with the State's theory of the crime, as well as the court's finding that defendant was not in a gang. The inference was thus demonstrably unreasonable and it was this inference that provided the sole legal basis for defendant's culpability on an accountability theory.

¶ 25 Furthermore, the overall evidence is still too conflicting and inconsistent to prove defendant guilty beyond a reasonable doubt. Here, defendant's statement was corroborated by McCaskill, Plummer and Bradley, who all testified that defendant had no knowledge of the planned shooting against the GD before or during the commission of the crime. See *id.*; *People v. Estrada*, 243 Ill. App. 3d 177, 184-85 (1993) (where to be convicted under a "common design" theory, in addition to being present at the scene of the crime, the accountable party must have some advanced knowledge of the criminal plan or scheme). In addition, Plummer testified to the grand jury that it was McCaskill who told Jackson "to wait." Plummer testified that it was McCaskill who shot AJ. Moreover, both Bradley and McCaskill testified that it was actually Brown himself who uttered the "wait" instruction. Thus, the record presents an extraordinary amount of conflicting evidence raising reasonable doubt of defendant's guilt. See *People v. McCarthy*, 102 Ill. App. 3d 519, 524 (1981) (where the reviewing court determined the evidence at trial raised a reasonable doubt of the defendant's guilt because the record contained too many instances of witnesses changing their stories, too many inconsistent details, and too many details that were exactly the same in the testimony of several witnesses). If anything, the evidence at trial is compelling that it was the State's witness, Brown, who could have been charged with being accountable for Jackson's actions.

¶ 26 It also merits mention that the testimony of Brown and Merchant is conflicting as to defendant's whereabouts at the time of the shooting. On direct examination, Brown provided a blow-by-blow of the minutes leading up to the shooting. Brown testified that after defendant told Jackson "to wait," defendant walked away toward the back of the mall. Brown did not testify that any significant period of time passed before Jackson fired shots. Thus, Brown's testimony suggests that Jackson fired immediately after defendant walked away. Merchant testified, however, that five minutes before the shooting she saw defendant outside the Subway at the opposite end of the strip mall. She also testified that defendant remained there when shots were fired. *Cf. People v. Nitz*, 143 Ill. 2d 82, 104 (1991) (where the supreme court concluded that there was no reasonable doubt of the defendant's guilt because the witnesses stated their time estimates were approximations). Thus, in contrast to Brown's testimony suggesting that defendant was at the bus stop immediately before the shooting, Merchant testified that the opposite was true.

¶ 27 The State also directs our attention to Figueroa's testimony that defendant fired *at* the crowd and Merchant's testimony that he fired blindly in contradistinction to defendant's testimony that he fired up in the air as a spontaneous response. Even assuming Figueroa's testimony was true in that respect, that alone does not demonstrate that defendant was acting in furtherance of codefendant's criminal design, rather than his own. See *People v. Phillips*, 2012 IL App (1st) 101923, ¶ 22 (where if the defendant did not know that his codefendant had a gun, then regardless of what else the defendant may have done, he did not intend to help his codefendant commit the crime); *Cf. People v. Coleman*, 168 Ill. 2d 509, 533 (1995) (where the

trier of fact rejected the defendant's "innocent hypothesis" theory because mere surmise or possibility was unsatisfactory to establish an accomplice committed the crime).

¶ 28 Based on the record as a whole, the trial court made an unreasonable inference when it concluded that defendant acted in a common design with his codefendant Jackson. This conclusion is simply improbable based on the evidence in this case and defendant's conviction cannot stand. See *McCarthy*, 102 Ill. App. 3d at 524. Therefore, the evidence was insufficient to sustain defendant's conviction.

¶ 29 Defendant now asserts that he should be charged with the lesser offense of aggravated discharge of a firearm. The State does not anywhere argue against this conclusion in the event defendant's conviction is reversed. Accordingly, we reverse defendant's conviction for first-degree murder and remand for sentencing for aggravated discharge of a firearm. In light of our determination, we need not address the other contentions argued by defendant or the State. As a final matter, however, we note that the parties dispute whether the trial court improperly required defendant to register as a sex offender for what is seemingly a nonsexually motivated offense. We direct the trial court to conform its determination in that regard to the Sex Offender Registration Act. 730 ILCS 150/1 (West 2006).

¶ 30 CONCLUSION

¶ 31 Based on the foregoing, we reverse the judgment of the circuit court and remand for sentencing on the lesser offense of aggravated discharge of a firearm.

¶ 32 Reversed and remanded for sentencing.