2020 IL App (3d) 180215

Opinion filed December 31, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Iroquois County, Illinois |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0215 Circuit No. 17-CF-04 |
| JASON D. SANDERS, | ) ) ) | Honorable James B. Kinzer |
| Defendant-Appellant. | ) | Judge, Presiding |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Presiding Justice Lytton concurred in the judgment and opinion.
Justice Holdridge specially concurred, with opinion.

**OPINION**

¶ 1       Defendant Jason D. Sanders was tried by a jury and acquitted of attempted first degree murder, aggravated discharge of a firearm, and unlawful possession of a weapon by a felon. The jury convicted Sanders of aggravated battery, unlawful possession of a stolen motor vehicle and the lesser-included criminal trespass to a vehicle. He was sentenced to two consecutive seven-year terms, to be served "day-for-day." He challenges both the conviction and the sentence. We reverse and remand.

¶ 2                              I. BACKGROUND

¶ 3        On January 3, 2017, Jason Sanders, a black man from Memphis, Arkansas, accepted a job

as a truck driver for Mika Logistics. Sanders was instructed to come to the company headquarters

in Addison, Illinois, with one of their truck drivers. Sanders rode with a company truck driver,

Dexter Ortiz, from Memphis, Arkansas, to a Pilot gas station in Gilman, Illinois, where he was

told that he would switch trucks and ride with another driver to Addison. Sanders entered the other

truck, where the driver was not present and began to move items from the front seat to the sleeping

cabin. The driver, Krzystof Bogucki, entered his truck to find Sanders moving his items. Bogucki

did not have knowledge that Sanders would be in his truck or that Sanders was expected to ride

with him to Addison. This led to an altercation, which escalated to a physical fight in the ditch of

the gas station. Bogucki was shot twice, Sanders drove away in Bogucki's truck.

¶ 4        Sanders was charged with attempted first degree murder (720 ILCS 5/8-4(a), 9-1 (West

2016)), aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2016)), aggravated discharge of a

firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)), unlawful possession of a weapon by a felon (720

ILCS 5/24-1.1(a) (West 2016)), and unlawful possession of a stolen motor vehicle (625 ILCS 5/4-

103(a)(1) (West 2016)). The case proceeded to trial on May 16, 2017. During *voir dire*, the trial

court inconsistently asked the panels of jurors if they "accepted and agreed to apply" the principles

of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Evidence was presented by the State,

and defense rested without submitting evidence. Defense counsel provided a closing statement as

follows:

"They had so many pictures and so many things or the other thing is he's black and black man belongs in a squad car in a cage. So that's either prejudicial, they want to be prejudiced against it. I don't see any other reason. ***

* * *

*** It's undisputed that Krzystof Bogucki, or whatever, goes—he sees a black guy in the passenger seat going through things and he thinks—he thinks he's being robbed or he's stealing something. ***

* * *

*** I guarantee you, as he said it's undisputed, he went there, he thought he was being robbed or something, was stealing, the very first thing you do call 911. You don't go up there, oh, black guy, I don't know who it is. I'm in a white community, a big black guy is in my car passenger seat, but I'm not going to get in the cab with him and, you know what, I'm also very calm, I'm calm hoping to calm him down. ***

* * *

*** Well, you know something, and I like to think I'm not a bigot, but or racist, but if I was in the south side of Chicago in an all-black area that I thought was dangerous and I'm the only white guy, I guarantee you I don't care what's happening I'm out of there and they can talk to me later. But I'm not going to stay because here's a black man in a whole white area afraid to possibly—because he's the only black guy and white guy thinks he can be in trouble.

* * *

*** [I]f I've gone through the town and I see confederate flags and that's fine, everybody can have their own, but to a black man that symbolizes slavery or racism.

3

He's a white man in a totally white place, never been there before. I would have been scared if I was a white guy in a totally bad place and they had black men, there are signs all over the place, I would be scared to death and I want to get out of there.***.
***

* * *

*** They are going to say that that showed intent to flee in a guilty mind and I'm saying you could also interpret that to be someone is afraid, scared in a white area, in an area that he doesn't know anyone and there's stories on both sides. The black abusing people and whites abusing people of race I'm talking about and could have been scared.

* * *

*** Do you believe that he would be calm? If you saw a black man, any man to be honest with you, sitting in the car, I don't know him and he's going through things, yeah I'm calm. No. Uh-uh. I am not calm. I am far from calm when I see that and it scares me. ***

* * *

*** He's a black guy in a white area and I hate to say it but it's true. Blacks don't trust whites and a lot of whites don't trust blacks. I wouldn't trust them if I was on the south side of Chicago, I'm out of there. Even if I did something wrong I'm out of there. I don't trust that I would be safe, I'm sorry. I don't think he did either.

* * *

I'm asking that the black man comes into this county is given the same, same courtesy as if a white man was sitting there. *** And I think a lot of people live here,

I'm not sure, just because it's a better environment to raise kids or to live safe. But it's also important that if you are going to live in this community besides those goals you want to be fair, you want to give a man who's a stranger a fair hearing ***. ***

*** Wouldn't you call the police? There's a black guy in there. Big black guy, kind of big. I would be afraid. I'm sorry, I would be afraid. ***

* * *

*** Let's find this black son of a gun guilty because he can't explain where the gun is."

¶ 5 As Sanders describes in his police interview, he was told to ride in Bogucki's truck, and so he began to prepare his place. Bogucki entered the truck and did not know Sanders or why he was present and began to react. Bogucki did not speak English, making the interaction more complicated. Sanders claims Bogucki pulled a gun and demanded that he exit the truck. The altercation moved outside the truck, where Bogucki charged Sanders, and the two began to tussle. Sanders describes that, amongst the chaos, the gun accidentally fired twice and shot Bogucki. Bogucki lay in the ditch where the altercation took place. Sanders claims that the gun fell into the ditch and that he does not own or possess a gun. Sanders then left the scene in the truck, headed south on Interstate 57 toward his home, and called his girlfriend to say he thought he "shot a dude" and that he believed he was going to be arrested. He did not call the police and was arrested in the Champaign area (about 51 miles from Gilman).

¶ 6 Bogucki testified that he entered the truck to find Sanders. After a verbal altercation, Sanders pulled out a gun and demanded that he exit the truck. Bogucki was then forced out of the truck by Sanders, where a physical altercation ensued. Bogucki tried to take the gun from Sanders, when he was shot in the chest and shoulder. He claims to have played dead, leading Sanders to

flee the scene with the truck. Bogucki then cried out and walked into the gas station, where the cashier and manager aided him and called the police. This incident led the police to search for and arrest Sanders.

¶ 7        Witnesses and law enforcement officers testified to their involvement in the response to. and investigation of, the incident and the arrest and interrogation of Sanders. Only the victim and defendant were present for the altercation involved in the arrest and charges in this case. The ditch and retention pond were both pumped, however, the gun was never found.

¶ 8        Sanders was found guilty of aggravated battery, unlawful possession of a stolen motor vehicle, and criminal trespass to a vehicle. He was found not guilty of all other charges. He was sentenced on August 11, 2017, to two concurrent seven-year terms of imprisonment for aggravated battery and unlawful possession of a stolen motor vehicle. The sentences were to be served day for day (clarified as 50%). The written sentencing order did not include the percentage of service for either sentence.

¶ 9        Sanders filed a motion to reconsider the sentence on September 11, 2017. The record included a handwritten letter from Sanders to the court, stating that the department of corrections had incorrectly calculated his sentence and was requiring him to serve 85% of that sentence. During a hearing on April 5, 2018, the court observed that the motion to reconsider was filed past the 30-day deadline. The defense pointed out that since the motion was filed on the Monday after the deadline (deadline was reached on a Saturday or Sunday), that the motion was timely. The court denied the motion as untimely and did not reach the merits of the motion. Notice of appeal was filed on April 16, 2018.

¶ 10                                    II. ANALYSIS

¶ 11        Sanders argues that the court erred by not properly administering the Illinois Supreme

Court Rule 431(b) (eff. July 1, 2012) principles. He also argues that the court erred in denying his

motion for reconsidering sentencing. We acknowledge these arguments, but they will not be

analyzed, as the court is overturning on the ineffective assistance of counsel issue. Sanders argues

that he did not receive a fair trial because of ineffective assistance of counsel, as counsel inserted

his race into the trial improperly, causing prejudice.

¶ 12        To prove ineffective assistance of counsel, the defendant must meet both prongs of the

*Strickland* test. The defendant must prove:

> "First, the defendant must show that counsel's performance was deficient. This
>
> requires showing that counsel made errors so serious that counsel was not functioning
>
> as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the
>
> defendant must show that the deficient performance prejudiced the defense. This
>
> requires showing that counsel's errors were so serious as to deprive the defendant of a
>
> fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687
>
> (1984).

Matters of trial strategy are generally immune from claims of ineffective assistance of counsel.

Defendant must also prove that there is a reasonable probability that, but for counsel's ineffective

assistance, the result would have been different. *People v. King*, 316 Ill. App. 3d 901, 913 (2000).

¶ 13        In general, wide latitude is afforded counsel in closing arguments. *People v. Crawford*, 343

Ill. App. 3d 1050, 1058 (2003). "Argument and statements that are based upon the facts in

evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper closing

argument." *Id.* Improper closing arguments will not result in reversal, unless they prejudice the

7

defendant, considering the context to the language employed, its relationship to the evidence, and its effect on the defendant's right to a fair trial. *People v. Thompkins*, 121 Ill. 2d 401, 445 (1988). Facts not in evidence may not be argued. *People v. Marshall*, 2013 IL App (5th) 110430, ¶ 15. The introduction of race into an argument is not permissible. *Id.* ¶ 13. Counsel should not align itself with the jurors against another group. *Id.* ¶ 16. Closing arguments are not evidence, and any argument that is not based in evidence should be disregarded. *People v. Thomas*, 200 Ill. App. 3d 268, 275 (1990).

¶ 14        In the case at bar, Sanders meets the first prong of the *Strickland* test. Defense counsel inserted the defendant's race, along with harmful stereotypes and personal bias opinions, into closing arguments. Sanders's race was not discussed as a factor to this incident, and racial stereotypes are not proper inferences made by any presented evidence of race. Defense counsel based a large majority of the closing argument on the race of Sanders. Counsel argued claims, describing the likely fears Sanders felt being "a black man in a white community," that were not based on evidence presented at trial and lacked merit. Counsel did not provide any statistical analysis to be assessed on claims of neighborhood diversity effects or racial issues. None of the racial comments were based on the evidence. Defense counsel not only inserted race, but also incorporated his own personal prejudice into the closing arguments. Following this, defense counsel tried to associate the jurors with his beliefs, with statements including. but not limited to, "Wouldn't you call the police? There's a black guy in there." These actions fall outside the bounds of sound trial strategy, and therefore show deficient performance by counsel. This falls below the standard of reasonable assistance.

¶ 15        Sanders also meets the second prong of the *Strickland* test. By addressing race and his own personal biases, matters not based on the evidence, defense counsel inadvertently prejudiced the

8

jury. Counsel addressed, in great detail, the intimidating appearance of his client. Counsel went so far as to refer to the client as a "[b]ig black guy, kind of big" and following this by saying, "I would be afraid." Defense counsel described Sanders as "a big scary black guy" and, while trying to group himself with the jury, discussed the natural fears that would take place. The aggregate of this sort of language could only create prejudicial effects, even if it was used as well-intentioned trial strategy. By emphasizing the defendant's race and the fear he would feel in the victim's shoes, based on no more that his personal views and not any evidence presented at trial, defense counsel created a prejudicial lens for the jury against Sanders.

¶ 16 The special concurrence agrees with our disposition but challenges what it states is an incorrect conclusion that the use of race is "categorically barred" and grounds to reverse "in all cases." *Infra* ¶ 25. This conclusion misinterprets the analysis, which does not suggest a categorical ban. The opinion does not discard the need to balance the probative value of the evidence against its prejudicial effect to determine admissibility. In the case at bar, the racial comments lacked any probative value, as they were unconnected to the facts presented. Under these circumstances, the comments would serve only to prejudice a defendant.

¶ 17 Here, the comments of defense counsel were directed solely to the jury's racial prejudice. Closing arguments were improper in the context and relationship to the evidence, which created prejudice and made a fair trial nearly impossible. The statements left the jury with a negative view of Sanders right before they decided the case. Though the argument was not based in fact, it had a prejudicial effect and could not reasonably be disregarded by the jury. If defense counsel uses race or any other factors not based on the evidence, and creates prejudice, there is inevitably ineffective assistance of counsel. We find the defendant received ineffective assistance of counsel.

9

¶ 18    On a final note, in his special concurrence, Justice Holdridge includes an explanation for his dissent from the majority order granting Sanders's motion to cite as additional authority the Illinois Supreme Court's June 22, 2020, "Statement on Racial Justice." *Infra* ¶ 26. Although he surmises the majority allowed the improper injection of irrelevant and extrajudicial considerations of race into the proceedings by allowing the additional authority, the statement was not cited in the opinion. Moreover, if the statement was used by the court, we would not consider its use improper.

¶ 19                              III. CONCLUSION

¶ 20    For the foregoing reasons, the judgment of the circuit court of Iroquois County is reversed and remanded for a new trial.

¶ 21    Reversed and remanded.

¶ 22    JUSTICE HOLDRIDGE, specially concurring:

¶ 23    I agree with the majority's judgment. I write separately to clarify what I believe to be the proper analysis that should guide our decision in this case.

¶ 24    I join the majority's reversal of the defendant's conviction because certain remarks made by the defendant's trial counsel during closing argument were not based on the evidence presented at trial and those remarks prejudiced the defendant by painting him in a negative light. In my view, these facts should be the only considerations justifying reversal in this case. Any other aspects of the trial counsel's remarks are neither legally relevant nor dispositive.

¶ 25    The majority states that (1) none of the racial comments in this case were based on the evidence presented in this case and (2) these comments prejudiced the defendant. *Supra* ¶¶ 14-15, 17-18. I agree with each of those statements. That is why I have voted to reverse the defendant's conviction. However, I dispute the majority's suggestion that the introduction of race into an

10

argument is categorically barred and is grounds for reversal in all cases. See *supra* ¶ 13 ("The introduction of race into an argument is not permissible.") In my view, the injection of race is reversible, as ineffective assistance of counsel only if it is (1) not based on the evidence and (2) prejudicial to the defendant. See, *e.g.*, *People v. Eddmonds*, 101 Ill. 2d 44, 66 (1984) (holding that, "[w]hile appeals to racial prejudice are to be condemned," defense counsel "was not incompetent for failing to object to a vague reference to race" that did not prejudice the defendant); *People v. Caffey*, 205 Ill. 2d 52, 105 (2001) (upholding defendant's death sentence despite prosecutor's "unnecessary and potentially offensive" reference to the race of an uncalled witness where the prosecutor's isolated remark did not incite racial prejudice and the court could not say that the guilty verdict would likely have been different had the prosecutor not made the remark); see generally *People v. Brown*, 86 Ill. App. 2d 163, 173 (1967) (ruling that, while evidence offered solely for the purpose of appealing to a jury's prejudice against an accused must be excluded, evidence which is relevant, based on the evidence, and otherwise admissible need not be excluded even if it mentions race). Because I believe that both criteria for reversal were met in this case, I join the majority's judgment.

¶ 26 One additional point bears mentioning. I have dissented from the majority's order granting the defendant's motion to cite the Illinois Supreme Court's June 22, 2020 "Statement on Racial Justice" as additional authority in this case. "The purpose of allowing parties to cite additional authority is to bring this court's attention to relevant or dispositive case law that was decided after the parties' briefs were filed" (*People v. Molina*, 379 Ill. App. 3d 91, 99 (2008)) or to other relevant and precedential legal authority promulgated after briefing. "Legal authority" is a "provision of law or regulation that carries the force of law, including, for example, statutes, rules and regulations, and court rulings." Law Insider Online Dictionary,

11

https://www.lawinsider.com/dictionary/legal-authority (last visited Dec. 13, 2020) [https://perma.cc/SA6J-4ETQ]; see also Collins Dictionary of Law, https://www.collinsdictionary.com/us/word-lists/law-law-terms (last visited Dec. 13, 2020) [https://perma.cc/VEG9-DDF8] (defining legal "authority" as "a judicial decision, statute, or rule of law that establishes a principle; precedent"); see also The Free Dictionary by Farlex, https://legal dictionary.thefreedictionary.com/authority (last visited Dec. 13, 2020) [https://perma.cc/SF29-2GWZ]; Black's Law Dictionary 153 (9th ed. 2009) (defining "authority" as "[a] legal writing taken as definitive or decisive; esp., a judicial or administrative decision cited as a precedent ***. The term includes not only the decisions of tribunals but also statutes, ordinances, and administrative rulings.").

¶ 27       The Illinois Supreme Court's June 22, 2020 "Statement on Racial Justice" is *not* legal authority. It is not a decision or ruling of the Illinois Supreme Court or of any other court. Nor is it a formal rule or jury instruction promulgated by the Illinois Supreme Court. It does not even articulate a policy formally adopted by our supreme court. Rather, it is nothing more than an informal "statement" posted on the Illinois Supreme Court's website in the wake of recent events. It is not, nor does it purport to be, legally binding on anyone. Accordingly, it may not be submitted or considered by this court as additional "authority." See, *e.g.*, *In re Michael H.*, 392 Ill. App. 3d 965, 968 (2009) (noting that even unpublished orders of our appellate court, which are legally binding upon the parties to a lawsuit and upon the Illinois trial courts, are not precedential "authority" and therefore may not be cited as authority or submitted as supplemental authority in our appellate court other than to establish double jeopardy, law of the case, *res judicata*, or collateral estoppel).

¶ 28    Allowing the defendant to submit the Illinois Supreme Court's "Statement on Racial Justice" as additional "authority" in this case establishes a bad precedent that will undermine the rule of law. There will be no limit to what parties may present as "authority" in future cases. Speeches by judges, legislators, or others, unpublished court orders, PR or policy statements, and internal court practices will all be fair game. "Authority" will no longer be limited to positive *law*, much less binding or precedential law.

¶ 29    Moreover, if this court were to consider the Supreme Court's statement on "racial justice" in deciding this case, it would allow the defendant to improperly inject irrelevant and extra-legal considerations of race into a legal proceeding, which is exactly what the defendant rightly accuses his trial counsel of doing. Thus, by considering the supreme court's statement, the majority contradicts our rationale for reversing the defendant's conviction.

¶ 30    There is ample binding legal authority on point that enables us to decide this case. We do not need to consult nonbinding "statements" by the supreme court to reach a ruling. Nor would it be proper for us to do so. See *Molina*, 379 Ill. App. 3d at 99; *Michael H.*, 392 Ill. App. 3d at 968; see generally *In re A.C.*, 2016 IL App (1st) 153047, ¶ 47 (" '[W]hen there is Illinois case law directly on point, we need not look to case law from other states for guidance,' when we have our own precedent to follow" (quoting *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 395 (2005))).

**No. 3-18-0215**

| | |
|---|---|
| **Cite as:** | *People v. Sanders*, 2020 IL App (3d) 180215 |
| **Decision Under Review:** | Appeal from the Circuit Court of Iroquois County, No. 17-CF-04; the Hon. James B. Kinzer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Andrew J. Boyd, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | James Devine, State's Attorney, of Watseka (Patrick Delfino, Thomas D. Arado, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |