2025 IL App (1st) 220564-U

No. 1-22-0564

Order filed March 24, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 08 CR 1009 |
| LESEAN JACKSON, | ) ) | The Honorable |
| Defendant-Appellant. | ) ) ) | Peggy Chiampas, Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith specially concurred.
Justice Pucinski dissented.

ORDER

¶ 1    *Held*: The trial court did not err in dismissing defendant's claims at the second stage of proceedings under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2018)) because defendant failed to establish a substantial showing that his trial and appellate counsel were constitutionally ineffective, that his sentence violated *Miller v. Alabama*, 567 U.S. 460 (2012), and progeny, or that his due process rights were violated. Defendant likewise failed to sustain his actual innocence claim following a third-stage evidentiary hearing, and thus, the trial court did not err in denying him relief. This court affirmed the judgment of the circuit court.

¶ 2      Defendant Lesean Jackson, who was convicted of first degree murder, appeals from the circuit court's order dismissing his petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) at the second of review and also denying him relief after a third-stage hearing. On appeal, defendant contends he established a substantial violation of his constitutional rights at the second stage of proceedings because his trial and appellate counsel failed to challenge jury instructions relating to accountability and personal discharge of a weapon; his due process rights were violated, where his codefendant was found guilty of a lesser crime allegedly based on the same evidence; and his sentence violated *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, where he was age 17 when he committed the murder but received a 60-year *de facto* life sentence. Defendant also maintains the postconviction court erred in declining to rule on a motion. Last, defendant argues he proved his actual innocence at the third-stage evidentiary hearing and the postconviction court's determination to the contrary was manifestly erroneous and contrary to the law. We affirm the dismissal of defendant's postconviction petition at the second stage and the denial of relief at the third stage.

¶ 3                                        BACKGROUND

¶ 4      Defendant, at age 17, was arrested after he fired several shots at rival gang members on October 17, 2007, but instead struck and killed 10-year-old Arthur Jones (AJ). He was charged with murder, along with three other codefendants, including Clarence Williams, Steven McCaskill, and Andrew Bradley (age 14). Defendant and Williams had a simultaneous but severed trial, with defendant proceeding before a jury, and Williams, before a judge.

¶ 5      Over the course of defendant's six-day jury trial in 2011, 15 witnesses testified. The State presented evidence that defendant was the principal offender in the shooting and also accountable for the actions of his codefendants. In relevant part, Johnell Brown testified that

defendant, Williams and McCaskill were gang members (collectively, the Stones) who controlled the north side of 55th Avenue, while rivals (the Gangers Disciples) controlled the south side. Brown knew the men from the neighborhood. Around 3:30 p.m. on the day in question, a gang brawl between these rivals ensued at the Shell gas station, located just across the street in the rival territory. Shortly thereafter, around 4 p.m., Brown saw defendant standing near a bus stop at Halsted Street and 55th Avenue (on the northeast corner). Defendant then pointed his semiautomatic handgun at the southwest corner of the intersection and fired four shots into the grassy area of the boulevard, where a group of youths had congregated. That group was comprised of Gangster Disciples, high school youths, and others, including the 10-year-old victim, AJ. Brown heard another round of shots as he ran away.

¶ 6    Around the same time, the victim's neighbor, Necko Sterling, also saw defendant aim and fire his gun toward the crowd in the grassy area, where Sterling had just seen AJ. Immediately after the shooting, AJ was discovered dead in that same grassy area with bullet wounds to his face and foot. There was no evidence of close-range firing. Five days later, Sterling identified defendant as the shooter from a physical lineup.[1] Although she had no vision in her left eye, she had 20/20 vision in her right eye.

¶ 7    Codefendant Bradley testified that around 4 p.m., codefendant McCaskill handed him a black semiautomatic gun, asking him to shoot the rival gang members. Bradley declined, but pursuant to McCaskill's orders, handed the gun to defendant, who was standing near the bus stop. Bradley then heard about three gunshots fired, coming from 55th, as he walked in the opposite direction.

---

[1]Although Sterling did not view a lineup that included McCaskill, Bradley, or Brown, the detective involved in the lineup had "no information whatsoever" that those individuals "had fired a gun into the crowd where Arthur Jones was standing."

¶ 8    Consistent with that testimony, Teddy Plummer made statements to the police, the Assistant State's Attorney, and testified before the grand jury that he observed Bradley place a 9mm handgun in defendant's hoodie pocket, and Plummer ultimately identified defendant as the shooter. McCaskill incriminated himself to police, resulting in charges for his role in the first degree murder of AJ. The State introduced evidence of these prior inconsistent statements at trial because both witnesses essentially recanted their statements. See 725 ILCS 5/115-10.1 (West 2010). At trial, Plummer testified that he saw Bradley pass the handgun instead to McCaskill, who then shot AJ.[2] McCaskill, for his part, denied ever seeing defendant holding or shooting a gun. Rather, McCaskill testified that he heard shots and ran away. This was contrary to the video of his interview with police, shown to the jury, wherein he stated that defendant shot the gun.

¶ 9    The State also presented evidence that defendant was accountable for the actions of codefendant Williams. Tierra Merchant, testified that around 4 p.m., she saw Williams fire a pistol in a southwest direction toward the Shell gas station, although Williams was situated in front of the Subway at the opposite end of the strip mall from the bus stop. No cartridge cases were recovered from that area, so the State theorized that Williams must have used a revolver. Evidence established revolvers do not emit shell casings. Additionally, Brown testified that Williams was in a gang and present at the gas station brawl earlier. Brown testified Williams had said "wait" to defendant just before the shooting.

¶ 10    Police recovered six fired cartridge cases from a 9mm gun by the bus shelter at Halsted and 55th Street, where defendant was reportedly located. The caliber and cases indicated a

---

[2]Plummer testified the first day of trial that he could not remember the day or the shooting of AJ because he had been hit in the head with a bat. Nonetheless, the second day of trial, he claimed to remember that McCaskill was the shooter.

semiautomatic gun was used. Police, however, determined that only five of the six cartridge cases were fired from the same firearm; the sixth case was fired from a different firearm.

¶ 11    The jury found defendant guilty of first degree murder and that he personally discharged a firearm during the offense. Defendant was sentenced to 40 years' imprisonment for the murder, plus 20 years for the firearm enhancement. A more detailed discussion of defendant's sentencing hearing, which involved a discussion of his youth and background, can be found in our analysis. See *infra.*, ¶ 67.

¶ 12    As for the codefendants, in 2010, McCaskill pleaded guilty to first degree murder in exchange for 20 years' imprisonment based on his role in obtaining and supplying the gun in this case. The factual basis underlying McCaskill's 2010 guilty plea was that defendant shot the victim, AJ. Bradley was charged with first degree murder for his role in murdering AJ but was subject to juvenile proceedings. In August 2009, he pleaded guilty to a reduced charge of aggravated battery and unlawful use of a weapon in return for his trial testimony in defendant's case. The record indicates he was released from custody in 2009. Following the bench trial, Williams was found guilty of first degree murder based on accountability and sentenced to a total of 43 years' imprisonment.

¶ 13    Defendant filed a direct appeal challenging, *inter alia*, the sufficiency of the evidence to sustain his conviction and claiming he was denied his constitutional right to effective assistance of counsel, where his defense theory was contradicted by the evidence and his trial counsel failed to impeach a witness with a prior inconsistent statement. He also challenged his sentence as excessive based on his criminal background and rehabilitative potential. In an unpublished order issued on December 26, 2013, this court affirmed defendant's conviction. *People v. Jackson*, 2013 IL App 1st 111717-U, ¶ 47. This court also issued an opinion in Williams' case the same

day, reversing and remanding the cause for resentencing on a lesser offense of aggravated discharge of a firearm after finding the evidence insufficient to establish that Williams was accountable for defendant's actions. *People v. Williams*, 2013 IL App (1st) 112693, ¶ 31. Crucial in that determination was that the trial court in Williams' bench trial specifically found he was not in a gang, and the evidence was contradictory as to both Williams' presence at the shooting and whether he encouraged defendant to shoot. *Id.* ¶¶ 23-29.[3] Following remand, the record indicates that Williams was ultimately sentenced to 13 years' imprisonment for aggravated discharge of a weapon. See *People v. Williams*, 2016 IL App (1st) 112693-UB, ¶ 38.

¶ 14    Defendant subsequently filed a *pro se* postconviction petition in February 2015. With the aid of counsel, defendant filed several supplemental petitions, including on October 30, 2018, November 29, 2018, and April 30, 2019.[4] The November 29 petition is missing from the record. In relevant part, defendant claimed his appellate counsel was constitutionally ineffective for failing to challenge the accountability instruction (IPI 5.03) and failing to argue that he was not proved "guilty of first degree murder based on accountability." Defendant maintained there was no evidence showing he and Williams acted in concert together, and the presentation of the accountability instruction to the jury resulted in confusion and prejudice. That, plus the failure to prove his accountability beyond a reasonable doubt, violated his due process rights. Citing

---

[3]Notably, Williams 'direct appeal was subsequently vacated, and this court was ordered to reconsider the judgment in light of *People v. Fernandez*, 2014 IL 115527, addressing accountability law. See *People v. Williams*, No. 117472 (May 28, 2014). On remand, this court ruled that *Fernandez* did not change the result in Williams' case, finding the evidence was insufficient to demonstrate that defendant was accountable for murdering AJ. *People v. Williams*, 2016 IL App (1st) 112693-UB, ¶¶ 34-38. Notwithstanding the fact that Williams' 2014 direct appeal was vacated by the supreme court, both parties erroneously rely on it.

[4]In postconviction counsel's "amended petition," filed on October 30, 2018, he attached defendant's *pro se* petition and asserted it supported the amended petition. We interpret that to mean that counsel's October 30 petition was in reality supplemental. By contrast, "[a]n amended pleading, complete in itself, supersedes the pleading that it replaces and the earlier pleading ceases to be a part of the record for most purposes, being in effect abandoned and withdrawn." *Morrow v. Pappas*, 2017 IL App (3d) 160393, ¶ 42.

Williams' case, defendant argued he was entitled to the same outcome and that the rulings on direct appeal were legally inconsistent.

¶ 15    Defendant added that the trial court in his case misinterpreted the facts forming the basis for instructions 28.04 and 28.05, relating to personal discharge of a firearm, and for the accountability instruction. He argued that trial counsel should have corrected the court's factual misinterpretation and appellate counsel was constitutionally ineffective for failing to argue the matter.

¶ 16    Defendant also asserted he was actually innocent based on affidavits from McCaskill, Williams, Bradley, Plummer, and a number of other individuals. He asserted codefendants' affidavits were previously unavailable, citing as reason their fifth amendment right against self-incrimination. Defendant claimed that per the affidavits, McCaskill was the shooter. In his own words, defendant was never involved or "even in the vicinity when the shooting occurred!"

¶ 17    Last, defendant argued he was entitled to a new sentencing hearing pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny given that he was age 17 when he committed the murder.

¶ 18    The State filed a motion to dismiss all of defendant's claims except that of actual innocence. The court granted the State's motion to dismiss at the second stage, and pursuant to the State's concession, the cause proceeded to an evidentiary hearing in August 2021 as to defendant's actual innocence claim relating to the murder of AJ on October 17, 2007. The hearing evidence, in brief, revealed the following. Dante Small, who was in the Department of Corrections (DOC) serving a 40-year sentence for attempted murder, testified that on the day in question, he and defendant were playing basketball at 56th Street and Emerald Avenue, several blocks southeast from the crime scene. Sometime in the afternoon, he heard about six gunshots

7

nearby, they resumed playing basketball, and saw some people running. Defendant and Small then departed. Several days later, Small learned defendant was arrested for the shooting, but he did not tell anyone that defendant was with him because he "just didn't."

¶ 19    Small testified that he drafted affidavits in 2014 without any prompting, because he had "learned about" defendant. Small had defendant's "people information," so he sent them the affidavits. After they were signed (but not before), Small spoke with defendant at Menard Correctional Center (Menard), where they were both housed. On cross, Small acknowledged that according to his own affidavit, in 2011, he had a conversation with defendant in the Cook County jail, wherein he told defendant "what happened to him was bogus. I know he was innocent." Small was unaware that the Gangster Disciples controlled the area where they played basketball. Although defendant did not testify at the hearing, his affidavit attached to his initial postconviction petition and his affidavit attached to his October 2018 petition, corresponded with Small's testimony; defendant stated he was playing basketball at 56th and Emerald at the time of the shooting.

¶ 20    Dimitri Buffer, in the DOC since 2010 for first degree murder, testified that he was at a bus stop in the middle of 55th Street on the afternoon in question. He saw McCaskill shoot into a crowd of 10-15 people who were standing nearby in the grassy area after they threw up gang signs. Contrary to other hearing and trial testimony, and although not entirely clear, Buffer testified that McCaskill was about 35 feet from him on the southeast corner of 55th and Halsted but shooting away from the gas station. Buffer, too, was housed in Menard with defendant. Both were specifically in the east house in 2014, but they never conversed. Buffer prepared affidavits in 2014 and 2017, giving them to a friend who then gave them to defendant's sister. On cross, he acknowledged he did not know who defendant was in 2007 but insisted defendant was not at the

8

bus stop. While the 2017 affidavit stated Bradley was near the bus stop on Halsted, the 2014 affidavit omitted that detail.

¶ 21    Plummer testified, as he did the second day of defendant's trial, that McCaskill was the shooter. Plummer had a solid criminal background and was currently in the DOC serving a 12-year sentence for convictions related to aggravated battery and aggravated discharge of a firearm. Bradley, who had an adult felony gun conviction following his release from his juvenile adjudication in the instant case, also testified that McCaskill was the shooter as 45 to 50 people approached them at the bus stop. Bradley was released from prison for his adult felony conviction in 2020, just prior to this postconviction hearing.

¶ 22    Plummer and Bradley further testified that McCaskill told them to make defendant the scapegoat (per Bradley, McCaskill told him this *before* the shooting), but they emphasized defendant was not there that day. Bradley testified Williams wasn't either. Plummer disavowed his original statement to police and grand jury testimony reporting that defendant was the shooter, and Bradley disavowed his trial testimony.[5] On cross, Plummer acknowledged disavowing prior statements that he had known defendant his entire life, testifying that he only knew defendant in passing. Plummer explained that he was trying to save his friend McCaskill from trouble, and both Plummer and Bradley testified that they feared McCaskill. Plummer prepared his affidavit in 2018 while in the Cook County jail. Bradley prepared the affidavit in 2014 because he wanted the court to know the truth. In 2019, the prosecutor and her investigator spoke to Bradley in prison for the purposes of this postconviction hearing, and he relayed that defendant "was out there" on the day in question arguing with McCaskill, but Bradley testified on redirect that he said this because he still feared McCaskill.

---

[5]At the postconviction hearing, Bradley testified that he had identified defendant as the shooter at the 2011 trial. However, at the trial, Bradley only testified that he handed defendant the gun.

¶ 23    McCaskill, who pleaded guilty in 2010 to the murder of AJ in exchange for 20 years, testified that on the day in question he was at the bus stop with Bradley. He then shot his gun towards the gas station at "hundreds" of gangster disciples as they came across the street armed with sticks and bottles.[6] He fired the gun more than once but did not remember how many times. Defendant, unlike McCaskill, was not involved in the earlier fight at the gas station, nor was defendant present at the shooting.[7] McCaskill told police defendant was the shooter in an effort to "save" himself. On cross, McCaskill acknowledged he lied to the court at his 2010 plea hearing when he verified that defendant was the shooter. He also lied to the police and at trial. Similarly, while he could have testified at defendant's 2011 trial that defendant was *not* the shooter, McCaskill omitted that fact. McCaskill wrote the affidavit in 2011 when he and defendant were in Menard, but they did not converse or discuss the affidavit. He wrote the affidavit and testified at the hearing because it was the right thing to do.

¶ 24    Milton Wardlaw, in the DOC for first degree murder, testified that he was a Gangster Disciple and knew defendant from basketball. Defendant was not present at the bus stop when the shooting occurred around 4 p.m. on the day in question, nor did defendant shoot at the 6-7 people congregated in the grassy area. Wardlow prepared the affidavit in 2015 after much soul searching, although he knew defendant had been charged with the murder in 2007, and no on suggested that he prepare the affidavit. In the affidavit, he stated that he did not see defendant on Halsted or Garfield (55th) that day. He gave the affidavit to a family member to pass along. On cross, Wardlow acknowledged he was in Menard with defendant in 2015 when he prepared his affidavit.

---

[6]In his affidavit, McCaskill averred "It was not Lesean that shot the Gun, It was me!"
[7]At defendant's trial, McCaskill denied being involved in the gas station brawl, and as to the murder, testified that he simply heard shots, then ran away.

¶ 25    LaFiesta Shadore Williams (LaFiesta) testified that she grew up with defendant, Bradley, and McCaskill in the neighborhood. At the relevant time on the day in question, she was inside a corner restaurant with metal gates over the windows, from which she saw McCaskill and Bradley by the bus stop, but not defendant. McCaskill shot towards a crowd of 20 to 30 people approaching him. She moved away from Chicago shortly after the shooting but knew defendant was charged within weeks of the shooting. LaFiesta prepared the affidavit in 2021. On cross, she stated that she ducked upon hearing three shots, then left the restaurant. Notwithstanding the shooting, LaFiesta did not see any victims across the street. She acknowledged speaking to Williams about the case a year before the hearing, but LaFiesta refused to speak to the State's investigators when they came to interview her in June 2021 for this hearing.

¶ 26    Last, codefendant Williams testified that he was released on parole following his 13-year sentence for the aggravated discharge of a weapon in the instant case but was then arrested again and charged with unlawful use of a weapon by a felon. He testified that he was present on the day in question for the earlier gang brawl at the Shell gas station, as was McCaskill. Later, he passed by defendant, who was talking to his girlfriend and standing by the Popeye's on Halsted and 54th Place, located north of the currency exchange (and bus stop where the shooting occurred). Williams then heard shots when standing by the Subway. He turned around and, as a reaction, fired three shots in a southwest direction towards a big crowd of people running towards him. He then saw McCaskill, Bradley, and Plummer running away from the bus stop, but defendant was not with them.

¶ 27    On cross, Williams clarified that he saw defendant at the Popeye's about 15 to 20 minutes *before* the shooting. He also saw defendant at 54th Place and Union just *after* the shooting. This was notwithstanding his affidavit, written in 2014 (when he was in Menard),

wherein Williams stated he did not see defendant before, during, or after the shooting.[8] In spite

of their simultaneous trials, Williams found out in 2014 about defendant's conviction from his

cousin, who said defendant had been found guilty and "had a lot of years." That's why Williams

prepared his affidavit on behalf of defendant. On cross, Williams stated the hearing was his first

time seeing defendant since the trial.

¶ 28    The State presented evidence from an investigator for the State's Attorney's office who

conducted a number of interviews in 2019 of these witnesses after they wrote their affidavits. He

testified to some discrepancies by the witnesses. Most notably, during Williams' 2019 interview,

Williams said that when shots were fired on the date in question, he saw McCaskill, defendant,

Bradley, and Brown. However, Williams then corrected himself and said he did not see

defendant there at the time of the shooting. Rather, he saw defendant at 54th and Union talking

to a girl about a minute and a half after the shooting. The investigator also interviewed

McCaskill in 2019. McCaskill initially said he did not even recall the shooting but then

remembered it and said he was not the shooter, nor was defendant present.

¶ 29    In an 80-page order, the postconviction court found that defendant had not presented

newly discovered or conclusive evidence of his innocence. The court found each and every

witness who testified at the hearing to be incredible. Accordingly, the court denied defendant's

postconviction petition following the evidentiary hearing. This appeal followed.

¶ 30                                ANALYSIS

¶ 31    The Act provides a procedural mechanism through which a criminal defendant can assert

that his federal or state constitutional rights were substantially violated in his original trial or

sentencing hearing. 725 ILCS 5/122-1(a) (West 2020); *People v. Davis*, 2014 IL 115595, ¶ 13.

---

[8]In his 2017 affidavit, Williams wrote: "Never did I see Sean-Sean [defendant] Before, During, nor After the Fight at the Gas Station OR the shooting."

12

The Act sets forth three stages of review for a petition. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first, without any input from the State, the circuit court may dismiss petitions that are "frivolous or * * * patently without merit," and if not then dismissed, the petition advances to the second stage, where the defendant with the option of appointed counsel must make a substantial showing that his constitutional rights were violated in order to be entitled to a third-stage evidentiary hearing. *Id.* ¶¶ 32-34; 725 ILCS 5/122-2.1(a)(2), (b) (West 2020). Thus, a defendant filing a postconviction petition is not entitled to an evidentiary hearing as a matter of right. *People v. Harris*, 206 Ill. 2d 1, 13 (2002).

¶ 32      When reviewing a motion to dismiss at the second stage, we accept as true all factual allegations that are not positively rebutted by the record. *People v. Lander*, 215 Ill. 2d 577, 586 (2005). We review the dismissal of a postconviction petition without an evidentiary hearing *de novo*. *Id*. We can thus affirm on any basis supported by the record. *People v. Lee*, 344 Ill. App. 3d 851, 853 (2003). However, where fact-finding and credibility determinations are made by the circuit court in a third-stage proceeding, its decision will not be reversed on appeal unless it is manifestly erroneous, *i.e.* error that is "clearly evident, plain, and indisputable." *Id*. Throughout the second and third stages of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 33           *Ineffective Assistance of Trial and Appellate Counsel Claims*

¶ 34      We begin with the challenged claims dismissed at the second stage of proceedings. Defendant contends he made a substantial showing that his trial counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to object to jury instructions. He specifically argues defense counsel was ineffective for failing to object to the

Illinois Pattern Jury Instructions, Criminal (IPI), 5.03 (effective Jan. 1, 2010), on accountability, and IPI 28.04 and 28.05/06, on the enhancement for personal discharge of a weapon during the offense.[9] Defendant argues his appellate counsel was ineffective for failing to argue these matters on appeal.

¶ 35    The State responds that defendant forfeited these contentions by failing to include them in his postconviction petition. We disagree. In defendant's initial *pro se* petition and the amended petition, filed October 30, 2018, as well as responsive pleadings, he delineated these issues. We thus proceed to the merits.

¶ 36    To prevail on a claim of ineffective assistance under *Strickland*, a defendant must show both that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). For prejudice, a defendant must show there's a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Dupree*, 2018 IL 122307, ¶ 44; *People v. Hale*, 2013 IL 113140, ¶ 18. A reasonable probability is a probability sufficient to undermine confidence in the result at trial. *Hale*, 2013 IL 113140, ¶ 18. If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, however, a court need not decide whether counsel's performance was constitutionally deficient. *People v. Evans*, 186 Ill. 2d 83, 94 (1999).

¶ 37    Claims of ineffective assistance of appellate counsel are measured against the same *Strickland* standard. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Appellate counsel's choices concerning which issues to pursue are entitled to substantial deference. *People v. Collins*,

---

[9]Although the heading of defendant's argument in his opening brief specifies that trial counsel was ineffective for failing to object to the instructions on personal discharge of a weapon, defendant proceeds to argue in the body that the failure to object also encompasses the accountability instruction. For the sake of clarity, we proceed in addressing both.

2021 IL App (1st) 170597, ¶ 71. Unless the underlying issue is meritorious, a defendant suffered no prejudice from counsel's failure to raise it on direct appeal. *Childress*, 191 Ill. 2d at 175. Accordingly, we first turn to defendant's underlying *Strickland* claims against trial counsel.

¶ 38    Here, defendant's contention that trial counsel was ineffective for failing to object to the aforementioned instructions is rebutted by the record. The record shows defense counsel objected to the accountability instruction 5.04, asserting there was insufficient evidence that Williams and defendant worked in concert and that the evidence regarding Williams' statements to defendant just prior to the shooting was conflicting. In addition, defense counsel also objected to IPIs 28.04 and 28.05/06, relating to the enhancement for personal discharge of a weapon during the offense. Defense counsel then included these arguments in his motion for a new trial.

¶ 39    Defendant nonetheless argues that the trial court misinterpreted the trial evidence, and this misinterpretation, which was the basis for giving the instructions, stood uncorrected. Specifically, when discussing instructions, and IPI 28.04, the court stated as justification: "Personally discharged, because there was allegedly two shooters out there and two casings to support that theory. So the defendant personally discharged." Defendant argues the trial court mistook Williams as a second shooter *at the bus stop*, and trial counsel's failure to correct this misinterpretation of the evidence constituted ineffective assistance of counsel. In other words, defendant argues that trial counsel rightly objected to the jury instructions but for the wrong reasons, and had he corrected the trial court, essentially the trial outcome would have been different.

¶ 40    In rejecting defendant's claim, we first address the trial court's comments allegedly mistaking Williams for the second shooter at the bus stop. Defendant is correct:  while there was evidence that Williams shot his gun from the nearby Subway, there was no evidence offered that

he shot his gun (which the State theorized was a revolver) at the bus stop. Nonetheless, the State also offered evidence showing that Williams was *near the bus stop* around the time that defendant shot towards the grassy boulevard, and Williams also had a gun. Given that there was an inexplicable sixth shell casing near the bus stop, it's possible the trial court believed that Williams was responsible for it.[10] The trial judge's statement is not clear, as there was much back and forth argument during the instructions conference with a lack of clarity from all parties involved. However, to say counsel's failure to correct the court's statement was prejudicial is entirely speculative. *Strickland* requires actual prejudice to be shown, not mere speculation. See *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 41    More importantly, the general rule is that "some evidence" must be presented to justify giving a jury instruction. *People v. Adams*, 394 Ill. App. 3d 217, 231 (2009). The decision of whether to give a particular jury instruction generally rests within the sound discretion of the trial court. *People v. Miller*, 2021 IL App (1st) 190060, ¶ 44. Here, the evidence supported that defendant personally discharged a firearm when he shot into the crowd. As such, IPIs 28.04 and 28.05/06 were properly given, and therefore defendant cannot show *Strickland* deficiency or prejudice as to trial or appellate counsel.

¶ 42    We reach the same result as to the accountability instruction, IPI 5.03. Only the "slightest evidence" is needed for the court to instruct the jury on the theory of accountability, and the evidence may be circumstantial. *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 35; see also 720 ILCS 5/5-2 (2010) (defining accountability). An accountability instruction, and one for the principal offender, may be given if the evidence supports the theory regardless of whether the

---

[10]Defendant fails to correctly cite the testimony establishing the two different shell casings, as required and in violation of our supreme court rules. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *infra*, ¶¶ 55-57. We further note that other than that sixth shell casing, there was no evidence of a third shooter, and the State did not present that theory at trial.

State advances the theory. *Id*. Here, the State jointly charged defendant and Williams with first degree murder in that they without lawful justification, intentionally or knowingly shot and killed AJ with a firearm or knew that their acts created a strong probability of death or great bodily harm to AJ and, during the commission of the offense, they personally discharged a firearm (Counts 5 and 6). As such, the State also sought to show that defendant and Williams were accountable to each other for the murder.

¶ 43    Evidence was adduced at trial that Williams and McCaskill were in a gang with defendant; that Williams was present at the Shell gas station, where the rival gang brawl ensued; that Williams was seen leaving the Shell gas station with McCaskill and heading north; that Williams, defendant, and McCaskill were seen walking through the mall area; that shortly thereafter, Williams was seen shooting by the Subway restaurant just prior to AJ's death; and that Williams also told defendant to "wait" just prior to defendant's own shooting.[11] Although some conflicting evidence existed, especially as to whether it was Williams who said "wait," this evidence at least supported instructing the jury on accountability under IPI 5.03. See *Miller*, 2021 IL App (1st) 190060, ¶ 44; see also *People v. Jones*, 175 Ill. 2d 126, 132 (1997) (noting, it is not the court's role to weigh the evidence upon giving a jury instruction).

¶ 44    Evidence showing that defendant obtained the gun from fellow gang members, McCaskill and Bradley, also unequivocally supported the accountability instruction. See *People v. Batchelor*, 202 Ill. App. 3d 316, 331 (1990) (a person can be held accountable if he attaches himself to a group that commits an unlawful act that they all apparently assent to). As stated, evidence showed McCaskill was present at the Shell gas station fight between rival gang

---

[11]At Bradley's plea hearing in August 2009, he stated he heard a second set of gunshots and then saw Williams running from the area. Bradley testified at trial that he believed he presented that evidence at the plea hearing but could not recall.

17

members and thus had a motive, which he shared with defendant, to shoot the rival members shortly thereafter. See *Jackson*, 2013 IL App (1st) 111717-U, ¶ 33 (noting defendant's motive based on gang membership). Bradley handed defendant the gun after declining to do the deed himself. McCaskill pleaded guilty to the murder of AJ and Bradley was subject to juvenile proceedings for the same offense. Defendant cannot establish *Strickland* deficiency or prejudice as to trial counsel in that regard.

¶ 45 Latching onto our appellate court case in *Williams*, defendant also insists that appellate counsel was constitutionally ineffective for failing to challenge the accountability instruction on direct appeal. Citing *Williams* and noting the simultaneous trial, defendant maintains the evidence of accountability was insufficient and absent that instruction, the "probability of [defendant's] conviction" was "more difficult." Defendant states that, if as in Williams' appellate case, Williams was not accountable for defendant's actions, then defendant "could not be accountable for Williams' conduct." Defendant further asserts the State "never argued that [defendant] was the actual killer who fired the fatal shot," and could not prove the proximate cause of AJ's death.

¶ 46 The State responds that the record unambiguously shows it charged defendant as both a principal and as an accountable party and the evidence at trial supported both theories, thus gutting defendant's claim. For the reasons to follow, we agree.

¶ 47 First, defendant conflates the standards for granting jury instructions at a trial with analyzing the sufficiency of the evidence on appeal. Merely because the evidence was insufficient to sustain Williams' finding of guilt by accountability in his direct appeal does not mean there was not the *slightest* evidence to support the accountability instruction at defendant's jury trial, which was all that was needed under the law. We have already delineated the evidence

18

supporting the instruction. We also note that while the trial court in Williams' case found he was not in a gang, the jury in defendant's case reasonably could have disagreed with that determination. They were different fact finders.

¶ 48     Second, where, as here, a general verdict is returned, the defendant is guilty as charged in each count, and it is presumed that defendant committed the most serious offense. *People v. Woods*, 2023 IL 127794, ¶ 57. Likewise, even assuming the accountability instruction were erroneously given, where the evidence of guilt is "clear and convincing," an instructional error may be harmless. *Id*. ¶ 56.

¶ 49     Here, the evidence of guilt was more that just clear and convincing. It was sufficient to prove beyond a reasonable doubt that defendant shot and killed AJ as the principal offender based on the testimony by Brown, Sterling, and Bradley. See *Jackson*, 2013 IL App (1st) 111717-U, ¶¶ 23, 29 (direct appeal holding the evidence was sufficient to sustain defendant's conviction beyond a reasonable doubt and that it was not closely balanced). Brown and Sterling testified that defendant stood at the bus stop on the northeast corner of Halsted and 55th, then shot into the crowd gathered across the street in front of the Shell gas station. Brown testified defendant used a semiautomatic gun. Sterling testified that she saw AJ among that crowd, which also included rival gang members, just before defendant fired his gun. After the crowd screamed and ran away, she saw AJ lying in the grass, and he was dead. Bradley testified that he handed defendant a semiautomatic gun pursuant to McCaskill's orders, to shoot rival gang members. Bradley then heard shots as he walked away. According to the forensic evidence, five shell casings (which a semiautomatic weapon emits) were recovered from the same bus stop that day. In addition to this evidence, the State presented prior statements to police and/or the State's Attorney by Plummer and McCaskill that defendant was the shooter, notwithstanding that they

essentially recanted those statements at trial. See 725 ILCS 5/115-10.1 (West 2010); *People v. Island*, 385 Ill. App. 3d 316, 347 (2008) (a recanted prior inconsistent statement can support a conviction).

¶ 50     In closing, the State presented two alternative theories of liability. The State heavily emphasized that the jury could find defendant guilty by accountability for the actions of Bradley, McCaskill, and especially Williams, insofar as they all "performed the acts that caused the death of [AJ]." However, contrary to defendant's claim otherwise, the State also argued that defendant was guilty as a principal, which the jury was entitled to believe. See *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 27. The State delineated the evidence above showing defendant was "the shooter" who caused the death of AJ and asserted defendant had the intent to murder him ("How do we know what this defendant's intent was? We know by his actions. He pointed a loaded gun at a group of people and he fired. *** [J]ust because he didn't kill his intended target doesn't mean he gets to walk, doesn't [mean] he gets to be found not guilty. He intended to kill or do great bodily harm. Well, his intent was met. Because guess what? Arthur Jones is dead.). The State further argued defendant's acts created a strong probability of death or great bodily harm to AJ or another and that defendant personally discharged the firearm. We also wish to emphasize that, regardless, arguments are not evidence; here, the evidence supported finding that defendant shot AJ as a principal offender. See *People v. Sanders*, 2020 IL App (3d) 180215, ¶ 13.

¶ 51     Thus, even if the accountability instruction were erroneously given, it was harmless. The jury verdict would have been the same absent the error because the evidence supported finding defendant guilty as a principal. See *Woods*, 2023 IL 127794, ¶¶ 56, 63; *Zirko*, 2012 IL App (1st) 092158, ¶ 39. Because challenging the accountability instruction on appeal would not have been

successful, there is no basis for finding appellate counsel ineffective.[12] See *Collins*, 2021 IL App (1st) 170597, ¶ 71 ("a defendant does not suffer prejudice from appellate counsel's failure to raise a nonmeritorious claim on appeal"); *People v. Caballero*, 126 Ill. 2d 248, 270 (1989). Defendant cannot make a substantial showing of *Strickland* prejudice.

¶ 52    Although defendant's claim fails on the prejudice prong, it's worth noting it fails on the deficiency prong, too. In October and November 2012, about a year before this court issued defendant's direct appeal, defendant's appellate counsel wrote him letters, apparently in response to defendant's "questions regarding the issues" the appellate defender was raising in her brief. In the correspondence, counsel explained she had raised "six very strong arguments" that she believed were "stronger than anything regarding accountability." She continued:  "Even when you take Williams completely out of the picture, the facts remain that a gun was fired from near the bus stop/currency exchange towards a crowd of individuals, one of whom died, and multiple witnesses identified the shooter of that gun. Ultimately, the jury found that the State had proven beyond a reasonable doubt that you were the shooter of that gun." In addition to the written correspondence, appellate counsel spoke to defendant on the phone and conducted legal research in response to his queries. Her responses, which include discussion of various cases, reflect thoughtful and reasoned decision-making. Appellate counsel's choices concerning which issues

---

[12]Relatedly, defendant contends his appellate counsel was constitutionally ineffective for failing to file a petition for rehearing (PFR) and petition for leave to appeal (PLA) in the supreme court after this court issued his unpublished direct appeal order and the opinion in *Williams*. Defendant has failed to cite the relevant authority for filing either petition or develop any argument as to how he would overcome forfeiture. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); *People v. Robinson*, 223 Ill. 2d 165, 173-74 (2006) (holding an issue not raised in the defendant's posttrial motion, his appeal before the appellate court, or his petition for leave to appeal to the supreme court was forfeited). Regardless, for the same reasons already delineated, his claim of ineffective assistance would have failed.

to pursue are entitled to substantial deference. *Collins*, 2021 IL App (1st) 170597, ¶ 71. Accordingly, defendant has failed to establish any deficiency.

¶ 53                                             *Motion Claim*

¶ 54    Defendant next contends the postconviction court erred in failing to rule on his "motion to clarify the record" before dismissing all but one of his claims at the second stage of proceedings. The State responds that defendant has not included that motion in the record on appeal, and therefore we must reject his claim. We disagree with the State in that specific regard. The common law record clearly contains a "MOTION TO CLARIFY TRIAL AND APPELLATE RECORD," filed on February 21, 2019, wherein defendant requests to supplement his "Verified Petition for Post-Conviction Relief." Defendant argued the direct appeal rulings in his case and *Williams* were inconsistent. He asked the postconviction court to reverse his murder conviction and resentence him for the lesser offense of aggravated discharge of a weapon.

¶ 55    Nonetheless, we observe that defendant's opening brief does not specify where in the almost 4,000-page record we can find this motion, as required. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (the appellant's argument shall contain his contentions and reasons therefor, "with citation of the authorities and the pages of the record relied on"); see also Ill. S. Ct. R. 612 (eff. July 1, 2017). Likewise, in violation of Rule 341(h)(7), he has provided only cursory citations to the record for his motion argument and failed to provide *any* legal authority in support of his claim that his due process rights were violated and the postconviction court abused its discretion. Points raised but not properly briefed are waived. *People v. Cruz*, 196 Ill. App. 3d 1047, 1051 (1990). Reviewing courts are entitled to have the issues clearly defined, with pertinent authorities cited and a cohesive legal argument presented. *People v. Clay*, 167 Ill. App. 3d 628, 637 (1988). This court is not a repository for an appellant to foist the burden of argument and research. *Id.*;

*Cimino v. Sublette*, 2015 IL App (1st) 133373, ¶ 3. Nor is it the obligation of this court to act as an advocate or seek error in the record. *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009). Our docket is full, and noncompliance with the rules does not help us resolve appeals expeditiously. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 15. Accordingly, defendant has waived his contention. See *Clay*, 167 Ill. App. 3d at 637.

¶ 56    We also take this opportunity to comment on the vast number of deficiencies in defendant's brief. First, defendant's jurisdictional statement does not contain any citation to the record or identify the dates of the judgments being appealed, in violation of Rule 341(h)(4) (eff. Oct. 1, 2020). Second, in the introductory statement of facts, defendant failed to cite to the record at all, violating Rule 341(h)(6) (eff. Oct. 1, 2020). Third, throughout his argument, defendant fails to cite the record or law in support of his claims, he cites some cases without a corresponding page number, incorrectly cites cases, and relies on overruled or unpublished cases, thereby violating Rule 341(h)(7).

¶ 57    Last, defendant notes he filed a number of supplemental postconviction petitions in the trial court. Although entitled "amended" petitions, he appeared to supplement petitions already filed rather than replace them. See *In re Haley D.*, 2011 IL 110886, ¶ 67 (noting, the character of the pleading should be determined from its content, not its label); *Morrow*, 2017 IL App (3d) 160393, ¶ 42 (noting, an amended pleading supersedes or replaces an earlier pleading). On top of this confusion, defendant has failed to clearly identify which postconviction petition he is operating under on appeal, and we note that one of them (that filed November 29, 2018) is missing from the record. Defendant also has not provided this court with any exhibits from his trial or third-stage postconviction hearing. Defendant, as the appellant, is responsible for providing a sufficiently complete record on appeal to support his claims of error. *People v.*

*Smith*, 106 Ill. 2d 327, 334-35 (1985). Any doubts which may arise from the incompleteness of the record will be resolved against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *McCann*, 2015 IL App (1st) 141291, ¶ 15. Based on the foregoing, we hold any deficiencies in the record and the briefs against defendant. To the extent any arguments remain unaddressed, it is due to these deficiencies.

¶ 58                    *Inconsistent Appellate Court Ruling Claims*

¶ 59    Defendant next argues, as in the aforementioned previous motion, that the direct appeal rulings in his case and *Williams* were inconsistent. He argues this violated his due process rights, and the postconviction court erred in denying him relief.

¶ 60    Defendant, unfortunately, does not cite any legal authority supporting his due process argument, thus waiving it. See *Cruz*, 196 Ill. App. 3d at 1051. Likewise, defendant repeatedly references the trial record in Williams' case. While the trials were simultaneous and some evidence was the same, it's clear some was different. There were different stipulations offered in Williams' case, and the arguments before the bench were different. See *People v. Williams*, 2016 IL App (1st) 112693-UB; *cf. Jackson*, 2013 IL App (1st) 111717-U. Defendant has failed to cite the common law record or report of proceedings in Williams' case, and we question whether that's even appropriate. See *People v. Hill*, 65 Ill. App. 3d 879, 885 (1978) (noting inconsistent criminal verdicts are confined to cases where the codefendants are tried together and jointly). We also note that to the extent defendant complains of errors in Williams' case, we have no jurisdiction or authority to address those under the Act.

¶ 61    Waiver aside, we wish to emphasize the obvious:  Williams and defendant, although codefendants, had severed trials before different fact finders, and the evidence against each defendant was different. No two trials may be presented in exactly the same manner, and as

stated, different triers of fact may reach distinct credibility determinations. *People v. Gharst*, 122 Ill. App. 3d 1, 5 (1984). Defendant and Williams' direct appeals make this much clear. Also, the acquittal of one of two jointly indicted defendants does not mean the other defendant cannot be convicted. *People v. Stock*, 56 Ill. 2d 461, 465 (1974); see also *People v. Schmitt*, 131 Ill. 2d 128, 139 (1989) (noting, separate trials warrant separate verdicts); *People v. Morrow*, 303 Ill. App. 3d 671, 679 (1999) (noting, the slightest difference in the evidence can be sufficient to support different verdicts). And, whether the evidence is constitutionally sufficient is wholly unrelated to the question of how rationally the verdict was actually reached. *People v. Cooper*, 194 Ill. 2d 419, 433 (2000). The supreme court was aware of our holdings in both cases and ultimately denied the petitions for leave to appeal. See *Williams*, 2016 IL App (1st) 112693-UB; *People v. Williams*, NO. 121070 (November 23, 2016); *People v. Jackson*, NO. 117320 (May 28, 2014).

¶ 62    Moreover, postconviction petitions are limited to constitutional issues that have not been, or could not have been, previously adjudicated. *People v. Rissley*, 206 Ill. 2d 403, 412 (2003). The remedy "is not a substitute for, or an addendum to, direct appeal." *Id.*, quoting *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994). Defendant's attempts at relitigating the sufficiency of the evidence based on the severed trial of his codefendant are inappropriate and do not constitute a constitutional violation within the Act's scope. See *People v. Enis*, 194 Ill. 2d 361, 379 (2000) ("Defendant cannot obtain post-conviction relief merely by rephrasing a claim which was previously addressed on direct appeal").

¶ 63                    *Juvenile Sentencing Claim*

¶ 64    Defendant next contends he made a substantial showing that his 60-year sentence violated his constitutional right to a new juvenile sentencing hearing under the principles in *Miller*, 567 U.S. 460, and its progeny. For the reasons to follow, we disagree.

¶ 65     *Miller* held that mandatory life without parole for juveniles under 18 at the time of their crimes violates the eighth amendment's prohibition against cruel and unusual punishments. 567 U.S. at 465, 479. Accordingly, our Illinois supreme court has held that *Miller* and its progeny apply to defendants who have committed offenses as juveniles and were sentenced to *mandatory* life sentences, whether natural or *de facto*. *People v. Clark*, 2023 IL 127273, ¶¶ 71-72. Yet, *Miller* did not foreclose imposing discretionary life-without-parole sentences on such offenders. *People v. Webster*, 2023 IL 128428, ¶ 20. Notably, a sentence of 40 years or less does not constitute a *de facto* life sentence. *Clark*, 2023 IL 127273, ¶¶ 72; *People v. Buffer*, 2019 IL 122327, ¶ 41; see also *People v. Dorsey*, 2021 IL 123010, ¶¶ 54, 65.

¶ 66     In this case, the sentencing range for first degree murder was 20 to 60 years (730 ILCS 5/5-8-1(a)(1)(a) (2004/5/6)), plus a 20-year enhancement for personally discharging the firearm (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2004/5/6)). Thus, defendant was subject to a minimum sentence of 40 years and a maximum sentence of 80 years. Defendant's sentence was discretionary, not mandatory, and thus was constitutionally sound. Contrary to defendant's contention otherwise, the Supreme Court in *Jones v. Mississippi*, 593 U.S. 98, 112-18 (2021), made clear that trial courts are not required to make separate factual findings or explanations as to a juvenile's "permanent incorrigibility" under a discretionary sentencing scheme. We observe that *People v. Wilson*, 2023 IL 127666, ¶ 42, expressly followed *Jones*, and thus overruled *People v. Holman*, 2017 IL 120655, ¶ 46, which held the opposite.

¶ 67     Regardless, here the record demonstrates that defendant's sentencing hearing comported with *Miller* principles. The trial court considered defendant's youth and its attendant circumstances before imposing the discretionary *de facto* life sentence of 60 years, which was 20

years above the minimum.[13] See *Miller*, 567 U.S. at 477-78; *People v. Clark*, 2024 IL 127838, ¶ 75-76; *People v. Lusby*, 2020 IL 124046, ¶ 52. Defense counsel argued defendant's age (17), immaturity, social environment, and rehabilitative potential precluded a lengthy sentence. Also pointing to the presentence investigation report, which showed defendant's minimal criminal background, counsel argued that defendant was unduly influenced by McCaskill, a gang leader, who ordered others to do his bidding. Counsel noted defendant lived in a bad area of town, but was attempting to obtain his GED and participating in community service. The court expressly considered defendant's young age, his family support, and the peer pressure, but found 60 years appropriate given that defendant was in a gang and shot into a crowd multiple times, killing a 10-year-old child. On direct appeal, this court upheld defendant's sentence in the face of his claim that it was excessive based on his youth and rehabilitation. *Jackson*, 2013 IL App (1st) 111717-U, ¶¶ 41-42. Defendant's *Miller* claim therefore fails.

¶ 68    For the first time on appeal defendant also argues that, as applied, his sentence violates the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). He asserts that the sentencing protections of the Illinois constitution are more expansive than those of the eighth amendment. In support, he cites our supreme court's decision in *People v. Clemons,* 2012 IL 107821, ¶ 39, which held that the Illinois proportionate penalties clause "provide[s] a limitation on penalties beyond those afforded by the eighth amendment," and the United States Supreme Court's decision in *Jones*, 593 U.S. at 120, which affirmed that nothing precludes individual states from providing greater sentencing protections to juveniles than the federal constitution. Relying on an appellate court case (without providing pincites) that has since been reversed, vacated and remanded (see *People v. House*, 2021 IL 125124, ¶ 43), defendant then presents a

---

[13]This includes defendant's hearing on his motion to reduce his sentence.

one-sentence argument that he's entitled to an evidentiary hearing regarding how "the evolving science of juvenile maturity and brain development applied to his specific facts and circumstances." (Emphasis in original).[14] Without distinguishing between whether he's arguing an eighth amendment or a proportionate penalties claim, defendant continues by stating that his conduct of firing into a crowd at a moment's notice after being asked "by another," and without having himself participated in the earlier gang fight, was "so unexpected and irrational that it had to be due to his lack of brain development and transient immaturity." The State, on the other hand, completely ignores defendant's proportionate penalties argument in its brief.

¶ 69     For the following reasons, we are unable to consider defendant's proportionate penalties argument. Section 122-2 of the Act provides that a postconviction petition "shall *** clearly set forth the respects in which [defendant's] constitutional rights were violated." 725 ILCS 5/122-2 (West 2020). Section 122-3 of the Act further provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2020). In interpreting these two sections, our supreme court has been adamant that "claims not raised in a [postconviction] petition cannot be argued for the first time on appeal." *People v. Jones*, 213 Ill. 2d 498, 505-06 (2004); see also *People v. Cathey*, 2012 IL 111746, ¶ 21 (explaining that "any issues to be reviewed must be presented in the petition filed in the circuit court."); see also *People v. Montanez*, 2022 IL App (1st) 191930, ¶ 40, *affirmed by People v. Montanez*, 2023 IL 128740 ("It is black letter law that a defendant may not raise an issue for the first time on appeal from the dismissal of a postconviction petition if the petition failed to include that issue." (citations omitted.)).

---

[14]Notably, the supreme court's decision in *House* was issued before defendant filed his opening brief on appeal.

¶ 70    Moreover, our supreme court has repeatedly held that the appellate court lacks the authority to ignore the strictures of section 122-3 of the Act and excuse an appellate waiver caused by the failure of a litigant to include issues in his postconviction petition. See *Jones*, 213 Ill. 2d 507-08. In fact, on more than one occasion it has criticized this court for inappropriately overlooking the waiver provision of the Act and addressing " 'claims raised for the first time on appeal for various and sundry reasons.' " *People v. Pendelton*, 223 Ill. 2d 458, 475 (2006) (quoting *Jones*, 213 Ill. 2d at 506).

¶ 71    In the present case, after thoroughly reviewing the record before us, we have determined that defendant did not include his proportionate penalties argument in his postconviction petition or any of the numerous supplemental petitions/pleadings he filed in the circuit court. He therefore did not bring that claim within the purview of the Act, which requires the assertion of a constitutional violation. See 725 ILCS 5/122-1(a) (West 2020); *People v. Allen*, 2015 IL 113135, ¶ 33 (a court at the first stage considers the petition's *substantive* virtue); *People v. Wright*, 189 Ill. 2d 1, 23-24 (1999), Justice Freeman, concurring, *overruled on other grounds*. Accordingly, the State never responded to this argument at the trial level, and the circuit court did not address it. *Cf. People v. Boclair*, 202 Ill.2d 89, 101 (2002) (noting that time limitations in the Act are considered an affirmative defense that can be raised, waived, or forfeited, by the State).With this record, we are compelled to conclude that the proportionate penalties' claim, raised for the first time on appeal, is barred by section 122-3 of the Act. See 725 ILCS 5/122-3 (West 2020). It's noteworthy that defendant also forfeited the proportionate penalties claim on appeal. See *Clay*, 167 Ill. App. 3d at 637. Defendant was a juvenile when he murdered AJ, and thus, his juvenile immaturity was already a given fact; the hearings that he now appears to reference have been reserved for emerging adults. See *House*, 2021 IL 125124, ¶¶ 29-32.

29

¶ 72                          *Actual Innocence Claim*

¶ 73     Defendant next contends the trial court's denial of his actual innocence claim following

the third-stage evidentiary hearing was against the manifest weight of the evidence. The State

responds that defendant has failed to undermine or contradict the postconviction court's 80-page

decision denying his petition. We agree.

¶ 74     To establish a claim of actual innocence, the supporting evidence must be newly

discovered, material and not cumulative, and of such conclusive character that it would probably

change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Edwards*, 2012

IL 111711, ¶ 32. These claims must be supported with new reliable evidence, such as

exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence,

not presented at trial. *Edwards*, 2012 IL 111711, ¶ 32. Because such evidence is simply

unavailable in the majority of cases, claims of actual innocence are rarely successful. *Id*. At a

third-stage evidentiary hearing, the defendant bears the burden of proof by a preponderance of

the evidence to show he was denied a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶

92.

¶ 75     To further delineate the actual innocence standards, we note that newly discovered

evidence is evidence that was discovered after trial and that the defendant could not have

discovered earlier with due diligence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009). Evidence is

material if it is relevant and probative of the defendant's innocence. *Robinson*, 2020 IL 123849, ¶

47. Noncumulative evidence adds to the information that the fact finder heard at trial. *Id*.; *People

v. Molstad*, 101 Ill. 2d 128, 135 (1984) (noting, it's difficult to see how admission of five new

affidavits would not produce new questions). Last, evidence is conclusive, when it, considered

along with the trial evidence, would probably lead to a different result. *Robinson*, 2020 IL

123849, ¶ 47. While this does not mean a defendant is innocent, it does mean that the facts and circumstances of the case should be scrutinized more closely to determine the defendant's guilt or innocence. *Ortiz*, 235 Ill. 2d at 337. This is the most important element of an actual innocence claim. *People v. Harris*, 2024 IL 129753, ¶ 65; *Robinson*, 2020 IL 123849, ¶ 47.

¶ 76 Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Robinson*, 2020 IL 123849, ¶ 48. This comprehensive approach involves credibility determinations that are uniquely appropriate for trial judges to make. *People v. Coleman*, 2013 IL 113307, ¶ 97. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 48. Probability, not certainty, is the key in considering whether another jury would reach a different result after considering the prior evidence along with the new evidence. *Id.*; *Coleman*, 2013 IL 113307, ¶ 97. As set forth, we review the trial court's decision to deny relief following an evidentiary hearing for manifest error, *i.e.* error that is "clearly evident, plain, and indisputable." *Coleman*, 2013 IL 113307, ¶ 98.

¶ 77 For the reasons to follow, we cannot say the court's determination was against the manifest weight of the evidence. Here, the court found every witness who testified at defendant's third-stage evidentiary hearing was incredible. The court concluded that the evidence, when considered along with the competent and substantial trial evidence establishing defendant's guilt, probably would *not* lead to a different result. In support and in an extensive, thorough order, the court then delineated each witnesses' affidavit statements, trial testimony (if applicable), hearing testimony, the court's credibility findings, and additional points. In short, the court found several of the witnesses were housed with defendant in the DOC and therefore had the opportunity to coordinate fabricated alibis or accounts of the shooting with defendant. To the extent some

31

disavowed contact with defendant prior to voluntarily writing the affidavits or claimed they wrote them for altruistic reasons, the court found that testimony incredible.

¶ 78   The court also pointed out a number of fatal inconsistencies in the affidavits and testimony, writing "these witnesses fail to get their own stories straight, commit instances of perjury, recant prior statements, and fail to even get key points of an alibi straight, [and] the inconsistencies of this collective testimony renders the story incredible." See *People v. Sanders*, 2016 IL 118123, ¶ 33 (noting, recantation testimony is inherently unreliable, and a new trial will not be granted on that basis absent extraordinary circumstances); *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (same); *cf. Coleman*, 2013 IL 113307, ¶ 106 (granting postconviction relief in the form of a new trial after concluding the defendant's actual innocence witnesses were "remarkably consistent on certain key details," including that the defendant was not present for the attack).

¶ 79   Most notably, the court found it illogical that defendant would be playing basketball south of 55th Avenue, established as rival gang territory. Furthermore, he could not be playing basketball there when the shooting occurred, as testified to by Small, and also be present just north of the scene of the shooting some minutes before and after it occurred, as testified to by Williams. See *id*. The court noted that Buffer's testimony placed "the shooter, crowd, and victim, at locations no one else mentions" and found Lafiesta's corner restaurant window view was obstructed by bars and illogical based on the photo exhibits and her testimony, plus her credibility was lacking. While Wardlaw testified that the crowd in the grassy area included 6 to 7 people, McCaskill testified it was filled with "hundreds" of gangster disciples who were armed with sticks and bottles. The court found Plummer was "consistently *** inconsistent with the

32

facts of this case" and also incredible. Williams also was "consistently inconsistent on his own involvement."

¶ 80    The court continued that McCaskill, who "flip flopped like a fish out of water," had already been convicted of the murder and served 75 percent of his 20-year plea sentence at the time of the present evidentiary hearing. Further, McCaskill's testimony that he implicated defendant at the 2011 trial in order to "save himself" held no water, where McCaskill *already had pleaded guilty* to a reduced sentence by defendant's trial and had begun serving his sentence (and this also gutted Bradley's claim of failing to come forward for fear of McCaskill, as McCaskill had already implicated himself). As the State now notes, McCaskill and Bradley could have participated as defense witnesses without waiving their fifth amendment privilege but inexplicably chose not to do so.[15] *Cf. Molstad*, 101 Ill. 2d at 134-35 (granting a new trial based on exonerating affidavits of the codefendants, delivered to the defendant's attorney after the codefendants were convicted but before they were sentenced). By the time of the actual innocence hearing, Bradley and Williams had likewise already served their terms for the related case.

¶ 81    Thus, the court found that the codefendants had nothing to lose in pinning the blame on McCaskill, in order to lessen defendant's significant sentence. The court found the codefendants likely conspired and coordinated in the actual innocence claim, noting that the majority of defendant's witnesses came forward after this court had affirmed his conviction on direct appeal and reversed and remanded that of Williams' on the lesser charge. In particular, the court wrote: "The most concerning relationship to this court is that of the co-defendants, where one co-Petitioner has received the brunt of the sentence for the case, and the other co-defendants then

---

[15]Their postconviction evidence also was not newly discovered. *Cf. Coleman*, 2013 IL 113307, ¶ 102.

work backwards from their much less significant sentences to try and alleviate the burden on their co-defendant while accepting all of the blame but none of the burden that would accompany the blame." In addition, the court found the witnesses' criminal records, gang membership or affiliation, silence during the initial investigation, and delay in coming forward impinged on their credibility.

¶ 82    Based on the foregoing, the court found defendant had failed to present conclusive evidence of his actual innocence, in addition to finding it was not newly discovered. The court concluded the "incredible testimony" presented at the hearing was not reasonably probable to change the result at trial, where defendant's conviction stemmed from the "consistent and credible eyewitness testimony from Sterling and Brown." See *Morgan*, 212 Ill. 2d at 155; *cf. People v. Burrows*, 172 Ill. 2d 169, 182-83, 86-90 (1996) (trial court's decision awarding a new trial was not against the manifest weight of evidence, where the State's main witness against the defendant recanted and admitted to murder, and her admission was corroborated by a newly discovered and unbiased witness, as well as forensic and testimonial evidence).

¶ 83    As set forth, the question in a third-stage evidentiary hearing is whether the allegedly new evidence places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *People v. Harris*, 2024 IL 129753, ¶ 65; *Robinson*, 2020 IL 123849, ¶ 48. This comprehensive approach involves credibility determinations that are uniquely appropriate for trial judges to make. See *Coleman*, 2013 IL 113307, ¶ 97; *Morgan*, 212 Ill. 2d at 161-62, 165. Therefore, defendant's request that we make credibility determinations anew on the cold record before us and reweigh the evidence presented at the hearing must be rejected. See *id.* Defendant has not provided grounds to disturb the trial court's well-reasoned determination in this case. See *Coleman*, 2013 IL 113307, ¶ 97. The new evidence he offered was not sufficiently compelling to

say the trial court's decision rejecting it was manifestly erroneous. See *Morgan*, 212 Ill. 2d at 161.

¶ 84                              CONCLUSION

¶ 85    Based on the foregoing, we affirm the judgment of the trial court dismissing defendant's postconviction petition at the second stage and denying him relief following a third-stage evidentiary hearing.

¶ 86    Affirmed.

¶ 87    PRESIDING JUSTICE FITZGERALD SMITH specially concurring:

¶ 88    I concur with the outcome of the decision but write separately only to address defendant's proportionate penalties claim.

¶ 89    I agree that defendant's argument is forfeited. The forfeiture, however, stems from private postconviction counsel's failure to raise the proportionate penalties issue in the amended petition before the circuit court and then properly argue it in this appeal. Although in 2013, on direct appeal we addressed the excessive nature of defendant's sentence in light of his youth and rehabilitative potential and found that the sentencing court did not abuse its discretion in sentencing him to 60 years imprisonment (*People v. Jackson*, 2013 IL App (1st) 111717-U, ¶¶ 41-42), since then the legal landscape regarding how we treat juvenile defendants for purposes of sentencing has vastly changed. See *e.g.*, *People v. Reyes*, 2016 IL 119271, ¶ 9 (stating that a juvenile defendant may not receive a *de facto* life sentence, or a sentence that cannot be served in one lifetime "without first considering in mitigation his youth, immaturity, and potential for rehabilitation"); *People v. Buffer*, 2019 IL 122327, ¶ 27 (holding that any sentence imposed on a juvenile defendant that exceeds 40 years is a *de facto* life sentence); 730 ILCS 5/5-4.5-105(a), (b) (West 2022), amended by Pub. Act. 99-68 (effective January 1, 2016) (requiring all

sentencing hearings for juvenile defendants to be *Miller* compliant and making firearm enhancements for juveniles no longer mandatory); 705 ILCS 405/5-130, 5-805, amended by Pub. Act. 99-258, § 5 (eff. Jan 1, 2016) (abolishing the automatic transfer provision of the Juvenile Court Act and no longer mandating the transfer of juvenile defendants charged with, *inter alia*, first degree murder to adult court); 730 ILCS 5/5-4.5-115(b) (West 2020), amended by Pub. Act. 100-1182, § 5 (eff. June 1, 2019) (directing that all juveniles and young adults under the age of 21 convicted of first degree murder are eligible for parole after 20 years' imprisonment); *People v. Hill*, 2022 IL App (1st) 171739-B, ¶¶ 41-50 (holding that the proportionate penalties clause was offended where the sentencing court failed to properly consider an expert's testimony regarding the express connection between the juvenile defendant's age and his commission of the offense). Accordingly, when amending defendant's postconviction petition in 2018 private counsel should have included an as-applied proportionate penalties challenge to defendant's sentence and his failure to do so constitutes unreasonable assistance. See *People v. Cotto*, 2016 IL 119006, ¶ 32 (citing Ill. S. Ct. R. 651(c)).

¶ 90     Moreover, under the unique circumstances of this case, I am deeply troubled by the disproportionate nature of defendant's sentence, particularly when compared to the minimal repercussions suffered by his two adult codefendants. See *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 53 ("Our supreme court has found that fundamental fairness requires that 'similarly situated' codefendants, who were involved in the same crime, should not 'receive grossly disparate sentences.' ") (citing *People v. Fern*, 189 Ill. 2d 48, 58 (1999) and Ill. Const. 1970, art. I, §§ 2, 11).

¶ 91     The gang-leader McCaskill, who obtained the weapon and ordered defendant to shoot at the crowd, was sentenced to only 20 years imprisonment after brokering a deal with the State.

Similarly, Williams, who fired his own gun into the crowd at the same time defendant did, ultimately received only 13 years imprisonment, even though the police could not ascertain from which gun the lethal shot was fired. In comparison, defendant who was a minor, and fired his gun only after McCaskill ordered him to do so, was condemned to 60 years' imprisonment (to be served at 100%), a sentence which our supreme court has held clearly constitutes a *de facto* life sentence. See *Buffer*, 2019 IL 122372, ¶ 40. As such, while the adult codefendants have already served their sentences, the juvenile defendant has been doomed to spend the rest of his life in jail. According to the Illinois Department of Corrections website of which we may take judicial notice (*People v. Ware*, 2014 IL App (1st) 120485, ¶ 29), defendant's earliest projected parole date is October 4, 2067, at which point he will be 78 years old, if he is lucky to survive. His discharge date is even later, in 2070.

¶ 92    Under this record, even though defendant has forfeited his proportionate penalties claim for review, he is not "without a remedy." *People v. Harris*, 224 Ill. 2d 115, 134 (2007); see also *Jones*, 213 Ill. 2d at 508-09. Instead, "a successive petition is the proper means for [him] to assert [such] a claim." *Harris*, 224 Ill. 2d at 134. Accordingly, if defendant believes that he has a meritorious proportionate penalties' claim I encourage him to seek leave of court to file a successive petition, raising both his proportionate penalties argument and asserting postconviction counsel's unreasonable representation for failing to raise this issue in his amended petition. See *id*.

¶ 93    In doing so, defendant should be cognizant that his sentencing claim is *not* a *Miller*-based claim, but rather a claim based on the disproportionate nature of his 60-year *de facto* life sentence. *People v. Masters*, 2024 IL App (4th) 230370, ¶ 57 ("Whereas the proportionate penalties clause requires *proportionate punishment*, *Miller*, by contrast, requires 'just a

discretionary sentencing procedure' in which the sentencing court takes the offender's youth into consideration before sentencing him *** to life imprisonment without parole. (Emphasis added.) [Citations.] *** The proportionate penalties clause is indifferent to sentencing procedure. If a life sentence is 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community [citation], the proportionate penalties clause does not care if the life sentence was mandatory or discretionary under statutory law: in either case, the clause is offended.").

¶ 94 Moreover, when filing his petition for leave to file a successive petition, I urge defendant to do exactly what he presently claims he would have done if permitted to proceed to an evidentiary hearing, namely offer evidence (perhaps a retained expert opinion obtained by the State Appellate Defender, *unavailable* to him at an earlier date because of the way juveniles were viewed at the time) explaining how because of his particular circumstances his brain development and maturity affected his thinking process when he committed the instant offense, such that a sentence which requires him to spend the rest of his life in jail, unlike his adult codefendants, is inhumane and does not afford him any opportunity for restoration to "useful citizenship" as is required under our state's constitution. See Ill. Const. 1970, art. I, § 11 ("[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."); *Masters*, 2024 IL App (4th) 230370, ¶ 58 (A sentence might be "cruel" and "inhumane" and "hence constitutionally disproportionate" where defendant's young age, mentality, and attendant characteristics are disregarded.); see also *People v. Gates*, 2023 IL App (1st) 211422, ¶ 73 (holding that an 18-year-old defendant's 48-year sentence constituted a *de facto* life sentence and violated the Illinois proportionate penalties clause).

¶ 95    For these reasons, I write separately, but ultimately, concur with the judgment.

¶ 96    JUSTICE PUCINSKI, dissenting:

¶ 97    No one, least of all me, can minimize the tragic horror of this case. An innocent 10-year-old was shot and killed in a cruel and wanton act which a jury found was done by the defendant, who, himself was 17 years old at the time.

¶ 98    However, that does not mean that I agree with the majority to affirm the trial court's denial of relief sought in Petitioner's Postconviction Petition after a third stage evidentiary hearing on his actual innocence claim.

¶ 99    There was plenty of testimony at the original trial. Some of it changed over the course of the investigation and the trial. But I am particularly interested in the testimony of Plummer that McCaskill was the shooter, and McCaskill's own testimony during his own trial that he was the shooter and that defendant was not.

¶ 100   Now, on top of the conflicting trial testimony, there are affidavits that indicate the defendant was not the shooter.

¶ 101   Further, I continue my belief that sentencing a 17-year-old to 60 years in 2011 perpetuates a two-tier juvenile justice system in Illinois that is unacceptable. It is now the law in Illinois that juvenile homicide defendants who were sentenced after June 1, 2019 "shall be eligible for parole review after serving 20 years or more" of their sentence. 730 ILCS 5/5-4.5-115(b) (West 2024) This means that some juvenile homicide defendants get to present a case to the parole board and some do not. It depends entirely on when the juvenile was sentenced. This is wrong.

¶ 102   There is no penological or societal reason for this distinction. It was entirely a political decision by the legislature. It is clear that making the laws is up to the legislature, but I continue to hope that the before-June 1, 2019, and the after-June 1, 2019, juvenile homicide defendants will

be treated the same. Some will make a good case before the parole board and some will not but ignoring the potential of rehabilitation flies in the face of Illinois' reliance on both punishment and rehabilitation as society's answer to crime.

¶ 103 Finally, this case does not even consider the research that we have seen on the brain development of 17-year-old boys, about which I have written extensively and will not repeat here. See *People v. Antoine Johnson*, 2024 IL App (1st) 230172-U, ¶ ¶ 75-143 (Pucinski, J., dissenting).